GEORGE P. SCOTTON, GEORGE C. SCOTTON and LYMAN J. SCOTTON trading as George P. Scotton & Sons, and also trading as Smyrna Nash Motors Company,

·*vs.*

GEORGE D. WRIGHT and GEORGE HARVEY WRIGHT, trading as George D. Wright and Son.

*Kent, May* 12, 1922.

Where the purchaser of a business, including its good will and agreement by the former owner not to engage in a competing business within the town, formed a partnership to conduct the business purchased by him, the partners can jointly maintain a suit to enforce the agreement not to compete without showing a formal assignment of the contract to them by the individual partner who purchased it.

A covenant not to compete with business sold by the covenantor is to protect the purchaser in the enjoyment of the business and its good will, and where the business is transferred by the purchaser, the agreement passes with the transfer, though not specially mentioned.

Within a covenant not to engage in a similar business in or adjacent to the town in which the business sold by the covenantor was located, the word "adjacent," which is not restricted to immediate contact with or touching, but is to be given a meaning according to the circumstances in which it is used, will be construed to include the conduct of the business within such distance of the town as substantially to compete with the business sold in

order to carry out the purpose of the covenant to protect the business and good will sold, and the covenantor, in engaging in a similar business, must decide at his own risk whether he would so compete.

Where the garage business, sold with a covenant not to engage in a similar business in or adjacent to the town, was located in a town covering a square mile of territory, through which a main north and south highway ran, the conduct of a garage at a place outside of the town, but along the main north and south highway and less than eight-tenths of a mile from the garage sold, is adjacent to the town, and its conduct is a violation of the covenant.

Where the seller of a garage business covenanted not to conduct a similar business in or adjacent to the town, except to carry on the business of his Buick agency which was reserved from the sale, the purchaser of the business could assume that a garage subsequently erected by the seller within the prohibited distance was intended only for the conduct of the Buick business, so that his failure to protest when he first learned of the intention to erect such garage did not preclude his right to prevent the conduct therein of a general garage business.

In a suit to enjoin the conduct of a garage business in violation of a covenant in a contract selling defendant's similar business to plaintiffs, evidence that some employee of complainants made a few small purchases from defendants without authority, and that complainants purchased some spare parts for a make of car which the defendants reserved the right to sell, does not show purchases by complainants at the new place of business, even if such purchases would show a construction of the contract by complainants as not prohibiting the business then conducted by defendants.

The defense of laches is not abandoned by withdrawing a demurrer to the bill raising that defense by leave of the court, because of the fact that the court considered the question could be better disposed of after answer and full hearing.

Lapse of time alone, unaccompanied by other circumstances, to constitute laches, must be such as to make the claim a stale one, in determining which courts of equity are disposed by analogy to follow the statutes of limitations, though such statutes are not in terms applicable to equity, but attending circumstances may make what might appear to be a stale claim one entitled to present recognition, or may deprive a fresh and recent claim of title to favorable consideration, the test being whether the delay is under circumstances that make it unconscionable for a court of equity to lend aid to its enforcement.

The purchaser of a business, with a covenant by the buyer not to conduct a competing business, is entitled to a reasonable time after the buyer engages in another business to determine the extent, if any, that the competing business would encroach upon his business, especially where there was a question whether the competing business was within the indefinite limit stated in the

covenant, and a delay of seven months, or at·most fourteen months, from first obtaining information of such business before filing a bill to enjoin its ccntinuance was not such laches as to bar relief, either by way of injunction against further business or by way of·compensation for damage. done to the good will. .

Though an aggrieved party may not himself work an injury, even against a wrongdoer, he is not to be held by equity to a strict and hard punctiliousness in saving the offender from the consequences of his own wrong.

Complainants are not required to elect between an injunction against future breach of a contract not to conduct a competing business and damages suffered by conduct of such business in the past, unless there is an inconsistency in reason between allowing both remedies for the same grievance.

Where a covenant by the seller of the good will of a business not to engage in a competing business contains, as is usually the case, a stipulation fixing an amount as liquidated damages for breach of such covenant, the recovery of such liquidated damages is inconsistent with an injunction against future breach of the covenant, so that, in such a case, the purchaser would be required to elect between recovery of the damages and injunction.

There is no inconsistency between the remedy of injunction to prevent future breach of a covenant not to conduct a competing business and the recovery of damages actually sustained by the conduct of competing business before the injunction was issued, there being no provision in the covenant for liquidated damages, so that complainant need not elect between his remedy by injunction and his recovery of past damages.

Equity, when once it acquires jurisdiction, may proceed with the cause to the administering of full relief to avoid a multiplicity of suits, so that, in a case of clearly equitable cognizance for relief by injunction, the court can decree, as incidental to the main relief, such damages, as are necessary in · order to do complete justice.

Since the damages which are occasioned by breach of a covenant not to engage in a competing business are typically unliquidated in character, so as to fall peculiarly within the province of the jury to ascertain, the amount of such damages will not be determined by the Chancellor nor by a master in a suit to enjoin future breaches of the covenant, but an issue will be directed to have the damages assessed by a jury.

BILL FOR INJUNCTION AND ACCOUNTING. The defendants on January 19, 1920, for the consideration of $10,000, agreed to sell and convey to George P. Scotton, one of the complainants, "all the garage property, garage business and good will, tools mechanical equipment and fixtures situated at their place of business in Smyrna, Delaware." It was provided in the agreement that settle-

ment should be made on February 2, 1920. On or about that date transfer of the real estate which consitutued the garage property and delivery of the business, good will, tools, etc., were duly made to George P. Scotton, the purchaser, who paid the price stipulated therefor.

The contract between the parties contained *inter alia* the following clauses:

"It is agreed that the parties of the first part reserve the right to sell Buick cars, parts for Buick cars, and to repair Buick cars in the Town of Smyrna, and this reservation is a limitation of the sale of the good will above expressed.

"And the parties of the first part undertake, covenant and agree to and with the party of the second part or his heirs, executors, administrators and assigns that they or either of them will not hereafter operate a garage or service station or engage in the sale of automobiles or the supplies, or repairs or accessories for same except by and according to the above and foregoing reservation anywhere in or adjacent to the Town of Smyrna any time after the said second day of February, A. D. 1920."

The bill in its fifth paragraph alleges, and the answer admits:

"That after the said sale and delivery, as aforesaid, your orator, George P. Scotton, immediately engaged in the said garage business and associated with himself in the said business James L. Scotton, George C. Scotton and Lyman J. Scotton."

It is further alleged and admitted that James L. Scotton withdrew from the business on September 1, 1920, since which time the complainants, trading as George P. Scotton & Sons, and also trading as Smyrna Nash Motors Company, have conducted the business so purchased from the defendants by George P. Scotton.

The bill also charges that in the summer of 1920, the defendants erected a garage about three-tenths of a mile south of the corporate limits of the town of Smyrna where, prior to the time of the filing of the bill and ever since, they have conducted a general garage or service station and engaged in the general sale of automobiles, supplies, repairs and accessories, and have sold among other things gasoline and oils and Ford motor vehicles, contrary to and in violation of their covenant and agreement above set out. The answer admits the engaging in the business

described from August 1, 1920, avers that the defendant's garage is eight-tenths of a mile from complainants' garage, denies that the conducting of their business at their present location is in violation of their said covenant, and avers that their intention to engage in such business was known to the complainants as early as April, 1920; that complainants gave no notice that they would regard the conducting of business by the defendants in the new place as a violation of their covenant until the present bill was filed on October 15, 1921, and, in substance, the garage would not have been erected, nor would the business have been begun, if the defendants had known that the complainants considered the same as in violation of the restrictive covenant. The answer further avers that the defendants have built up a new business for themselves in their new location, and have established a good will of considerable value; and that the court has no jurisdiction to grant relief for any damages, if any the complainants may have suffered, because of the failure of the complainants to give notice of their objection, their allowance of fifteen months of time to run before instituting suit, circumstances which, they aver, constitute laches. The defendants also aver in their answer that these circumstances, combined with the further fact that complainants have from time to time during the period from August 1, 1920, to October 15, 1921, dealt with the defendants at their new place of business, constitute in law a practical construction of the contract in favor of the defendants by the parties interested, which construction the complainants are not now at liberty to controvert.

The relief asked is that the defendants may be enjoined from continuing to conduct their said business except to the extent allowed by the covenant with respect to Buick cars, and that the respondents account for and pay to the complainants their profits and damages for the alleged breach of the restricted covenant.

*William M. Hope* and *James I. Boyce*, for the complainants.

*William H. Boyce, Arley B. Magee* and *Daniel O. Hastings*, for the defendants.

THE CHANCELLOR. A question is first made as to parties. The covenant having been made with George P. Scotton individually, has the firm of George P. Scotton, George C. Scotton and

Lyman J. Scotton, trading as George P. Scotton & Sons, and also trading as Smyrna Nash Motors Company, any right to relief because of breach thereof?

The covenant in terms is in favor of George P. Scotton, his heirs, executors, administrators and assigns. There is no evidence showing a formal assignment by the convenantee of the benefits of the covenant to the partnership. It is admitted, however, that when George P. Scotton took possession of the garage property on February 2, 1920, and undertook to conduct the business which he had purchased, he associated with himself his three sons, one of whom withdrew from the business about September 1, 1920, since which time the other sons have continued with their father in the business. The evidence shows the father and sons to have been associated in the business as partners. It is clear that whatever may have been the manner in which the partnership was organized, whether by formal articles and written assignments and transfers to it of the assets, the partnership did as a matter of fact take over from George P. Scotton, conduct and carry on the business which George P. Scotton had purchased from the defendants.

Does the fact that there is no evidence of a formal assignment by George P. Scotton, the purchaser, to the partnership of the covenant on the part of the defendants not to engage in a similar business, operate to prevent the granting of relief to the partnership which George P. Scotton formed? I think not.

The purpose of the covenant was to protect the purchaser in the enjoyment of the business and its good will. Such a covenant "is not personal, but inures to the benefit of one to whom it is assigned with the business." 20 *Cyc.* 1281. And where the business is transferred, the agreement not to compete goes with it even though not specially mentioned. *Palmer v. Toms*, 96 *Wis.* 367, 71 *N. W.* 654; *Knowles, et al., v. Jones, et al.*, 182 *Ala.* 187, 62 *South.* 514; *Public Opinion Publishing Co. v. Ransom*, 34 *S. D.* 381, 148 *N. W.* 838, *Ann. Cas.* 1911A, 1010; *Gompers v. Rochester*, 56 *Pa.* 194. If, therefore, the case is otherwise a proper case for relief, the fact that the bill is filed by the partnership, the transferee of the purchaser from the defendants, cannot serve to defeat it.

The next inquiry is: Does the bill set forth a case calling for equitable relief?

At the heart of the case, of course, is the restrictive covenant by which the defendants agreed that—

"They would not hereafter operate a garage or service station, or engage in the sale of automobiles, or the supplies, or repairs or accessories for same, except by and according to the above and foregoing reservation anywhere in or adjacent to the Town of Smyrna any time after the said second day of February, A. D. 1920."

The reservation referred to is the right on the part of the defendants "to sell Buick cars, parts for Buick cars and to repair Buick cars."

The population of the town of Smyrna numbers about 1,800 or 1,900. It is a square mile in area. The center of the town is at the intersection of Main and Commerce Streets, and the town limits extend a half mile from this intersection along the two streets in a north, south, east and west direction. The garage erected by the defendant, George D. Wright, where he and his son, the other defendant, carry on the general garage business about which the bill complains, is located on the north and south highway running through Smyrna, two thousand and ten feet south of the southern line of the town, less than three-tenths of a mile, making a distance from the center of the town of about four thousand six hundred and fifty feet. The garage which defendants sold to the complainant, George P. Scotton, is located on the same highway (Main Street) between the center of the town and its southern boundary line. So that the distance between the two garages is less than the distance from the center of the town to the garage of the defendants. The north and south traffic through Smyrna goes on Main Street, passing both garages. The towns nearest Smyrna on the north and south highway are Odessa on the north, a small village some twelve or fourteen miles distant, and Dover, which is eleven miles to the south. To the west of Smyrna is Clayton, a fair size town, two miles distant. Cheswold off the main highway to the south, is an incorporated town between Smyrna and Dover.

One of the points to be passed on is whether, or not, the business conducted by the defendants is being conducted "in or ad-

jacent to the town of Smyrna." Of course it is not being conducted *in* the town of Smyrna. Is it being conducted "adjacent" thereto?

The reported cases defining and construing the word "adjacent" are numerous. It would be profitless to refer to the many cases in which the word has been defined. In 1 *C. J.* 1194, the following are given as some of the meanings which courts have attributed to it:

"Abutting; adjoining; adjoining or contiguous; attached; beside; bordering on; bordering upon something; close or contiguous; close or near by; in the neighborhood or vicinity of; lying close; lying close or near to; neighboring; lying near, close or contiguous, but not actually touching; near, nigh, neighboring, close; near by; neighboring, but not necessarily in contact; next; touching or bounded by."

In terms of lineal measurement it has, according to the circumstances of each case, ranged from immediate contact with a line, to a distance of miles therefrom. The meaning to be attributed to the word is to be derived not from arbitrary definitions, but from the context in which it is found, the circumstances surrounding its use and the purposes sought to be subserved by its employment. In *People ex rel. Sackmann v. Keechler*, 194 *Ill.* 235, 241, 62 *N. E.* 525, 527, the court in construing a clause in a school law, after noticing various meanings which had been given to the word "adjacent," said:

"We do not regard any of these cases as furnishing a guide by which to arrive at a definition of the word as used in the foregoing section. It has no arbitrary meaning or definition. Its meaning must be determined by the object sought to be accomplished by the statute in which it is used. This consideration manifestly controlled each of the courts in the interpretation placed upon the word in the cases cited."

Likewise in the pending case, the word as used in the agreement of sale, is to receive that one of its meanings which in fairness can be said to best meet the object sought to be accomplished by the parties who used it. The primary, and indeed the only, purpose of the covenant was to protect the business and good will which were being sold, from any loss or damage in the hands of its purchaser by reason of competitive encroachment on the part of its former owners. This protection, the purchaser bought, and this, the seller sold. If "adjacent" to Smyrna has the narrow meaning

of being in immediate contact therewith, it must be manifest that the purchaser could have no security in the enjoyment of that which he had bought. Such a narrow construction would result in the view that these parties had contemplated that the good will, though it might be impaired, if the sellers engaged in business in Smyrna, or on its line, would be entirely unimpaired if the sellers set up in business just a few inches away.

This would be absurd. If, however, it be once conceded that "adjacent" is not restricted to immediate contact with, or to touching, then what is the limit to be placed upon the distance that may intervene between the town and the new place of business, when the latter will cease to be adjacent to the former?

This question is to be answered in the light of the purpose which the parties were seeking to express. That purpose as before observed, was to protect the business and good will from injurious competition on the part of the seller. Just how far distant the new place of business could be located without defeating this purpose cannot be definitely stated. If the defendants chose to set up again in the same business they had formerly engaged in, the responsibility was on them to decide at their own risk whether their new location would be such as would in fact encroach upon the business they had sold. Whatever might be the view with respect to whether engaging in the garage business at a place more distant than the one where the defendants are now carrying on their business would as a matter of fact be forbidden as "adjacent" to Smyrna, the evidence before me is convincing that the business conducted by the defendants at their present location is in competition with the business of the complainants and, so long as it is conducted, prevents the complainants from the full enjoyment of the benefits which the defendants sold and which they agreed to abstain from injuring.

The size of the town of Smyrna, its location with respect to other towns, the course of travel through it and the distance between the two garages, are all such as unquestionably put the defendants in competition with the complainants. The business of the former must, under the facts shown, thrive to an extent at least at the expense of the business of the latter. This being so,

the defendants' garage is "adjacent" to Smyrna within the meaning of the contract.

Though the court in *Up River Ice Co. v. Denler*, 114 *Mich.* 296, 72 *N. W.* 157, 68 *Am. St. Rep.* 480, does not give the reasons for its views, yet it must have been on such considerations as I have herein expressed that the word "adjacent" in a contract not "to engage in the ice business at Port Huron or adjacent thereto" was held to mean "in any territory which might reasonably be reached for delivery of ice by the Up River Ice Company with its teams and wagons."

This being the view of the court as to the meaning of the agreement and the effect of the evidence, it follows that the complainants are entitled to relief unless there be something else in the case which would make it inequitable to grant relief.

It is urged that the fact that the erection of a garage by the defendants at the place referred to was well known to the complainants from the time the construction was commenced, and that the failure of the complainants to assert an objection on the ground that the erection of a garage at that place would be in violation of the restrictive covenant, constitutes evidence that the parties gave a practical construction to the contract to the effect that the location of the garage was not "adjacent" to Smyrna. This contention would justify an examination of the question of when and under what circumstances the parties to a contract may, by their conduct, give to it a practical construction. But I do not feel disposed to examine that question for the reason that under the facts in this case the complainants were entitled to believe that the garage in course of construction by the defendants was intended to be used within the terms of the contract existing between the parties; that is, that it was intended to be used for the purpose of carrying on the Buick business which the defendants had reserved the right to conduct.

There is nothing in the evidence showing that defendants were laying out their money for the purpose of invading the field which they had bargained to stay out of. No information was given to the complainants of how far the defendants proposed to go in conducting business at their new stand. It is very clear that the silence

of the complainants, if it could be of moment under other circumstances, can be of no significance under these.

It is also said that the complainants made purchases from the defendants at the new place of business and that this fact shows that the complainants, as a matter of practical conduct, recognized the business carried on by the defendants as permissible under the contract. I cannot accede to this view. If for no other reason, the contention cannot be sustained because the evidence does not fairly sustain the fact upon which the argument is constructed. The most that appears is that some employee of the complainants may have made a few small purchases without being directed so to do, and that a few Buick parts, which of course the defendants were under the contract at liberty to sell, were possibly bought. The foundation of facts failing I need not pause to examine the argument which is erected thereon.

It is also urged by the defendants that—

"the complainants have slept on their rights and have permitted the defendants to build up a profitable business during this lapse of time without any question on the part of the complainants and are guilty of such laches as will cause the court to refuse relief by injunction."

Before considering this contention, it is first necessary to notice an objection on the part of the complainants to the effect that the defendants cannot now raise the defense of laches because of the fact that a demurrer to the bill which raised the same question was withdrawn and the question is, therefore, to be regarded as abandoned. The withdrawal of the demurrer was by leave of the court and was because of the fact that the court considered the question of laches could be better disposed of after answer and full hearing.

Whatever might in general be the consequences of a withdrawal of a demurrer, it cannot be said that under the circumstances attending the withdrawal of the demurrer in this case the defendants are thereby foreclosed from insisting upon the point which their demurrer raised. They are entitled under the pleadings to have their contention passed upon by the court after hearing.

Delay in the assertion of a right under circumstances that make it unconscionable for a court of equity to lend aid to its en-

forcement, has ever been regarded as affording complete protection to those against whom the jurisdiction of equity may be invoked. The length of time necessary to constitute such delay is not fixed and definite. It will vary with circumstances. Lapse of time alone, unaccompanied by other circumstances, in order to constitute laches must be such as to make of the claim a stale one, and where such is the case courts are disposed by analogy to follow the periods of limitations defined by statutes of limitations, though the same are not in terms applicable in equity. But attending circumstances may be such as to attribute to what might appear to be a stale claim the feature of being a just one entitled to present recognition by a court of equity, or, on the other hand, to deprive what might appear to be a fresh and recent claim of all title to favorable consideration.

Time, therefore, while it is an important element in ascertaining whether there be laches, is by no means controlling. The circumstances of each case are all to be considered and the question of laches determined by whether or not the complainant acted with that degree of diligence which the situation not alone of himself, but as well of the defendant in fairness and justice required. I do not feel called upon to advert to the many sorts of circumstances which on the one hand have been allowed as sufficient justification for the present recognition of claims whose origin runs back for many years, or, on the other hand, have been held to render inequitable the affording of relief in causes of action which are of recent birth.

In the instant case the erection of the competing garage was begun in April, 1920, and completed in August of the same year. As before indicated, there was no duty resting on the complainants to make protest to the defendants against the erection of their garage. This is so for this reason, if for no other, namely, that the mere erection of the garage was no notice that the same was intended to be used contrary to the terms of the agreement between the parties which permitted the defendants to engage in the business to a limited extent. The erection of the garage by the defendants was entirely consistent with their strict observance of the covenant. So long as the defendants confined themselves to the Buick business, they had a right to operate their new garage.

When they extended their operations, however, into the field of the general garage business, they violated their agreement and supplied the complainants a just grievance.

It may be conceded that it was thereupon incumbent upon the complainants to act with reasonable promptitude in asserting their insistence upon a strict observance of the contract, for it is hardly conceivable that a Court of Chancery would countenance indefinite and prolonged delay after full notice of the facts had been acquired by the aggrieved parties. Unless some limit is to be placed upon the amount of time during which the beneficiary of such a contract as this may sit by and see his adversary work to his own prejudice, it is manifest that the contract could be turned into an instrument of oppression.

In the instant case, the testimony discloses that the complainants began to observe that the defendants were breaching their contract by invading the forbidden business about the spring of 1921, and had certain knowledge of the fact during the summer of 1921. Up until March, 1921, the defendants did a Buick business, as they had a right to do. They then surrendered their Buick agency and entered into a contract for the Ford agency. It was then, or shortly thereafter that the complainants began to see evidences of a violation of the contract on the part of the defendants. One of the complainants, in his testimony stated that the complainants claim damages due to a loss of business from August, 1920, from which time he noticed a falling off of their own business. This falling off in the business was noticed by him, but he did not pay attention to the cause of it until the spring of 1921. At another point he said he noticed the damage from the Wright competition after August, 1920.

As stated, the garage of the defendants had been built and completed as long before as August, 1920, and used during the interval for a permitted business. The present bill was filed October 13, 1921. A period of seven months intervened between the surrendering of the Buick agency, the commencing of the new and forbidden business, and the filing of this bill; and if August, 1920, be taken as the extreme point of time from which the complainants noticed the Wright competition, then a period of fourteen months intervened from then until the filing of the bill. The

precise length of time intervening between the acquiring of knowledge that the new business was in fact competing with the old business and the filing of the bill, is difficult to fix. But at whatever point it is fixed, I am of opinion, under all the circumstances, that the complainants acted with due diligence. They were entitled to watch their situation for a reasonable length of time in order to observe the extent of the inroads, if any, that would be made upon their business. In view of the indefiniteness of the word "adjacent" appearing in the contract, was it not necessary for them to so wait?

While as against even a wrongdoer the aggrieved party may not himself work an injury, yet he is not to be held to a strict and hard punctiliousness in saving the offender from the consequences of his own wrong. The complainants had a right to take a reasonable amount of time to observe the nature of the business the defendants were going to pursue, to witness for a reasonable time its effect upon their own business, and to deliberate upon the course they should pursue.

I am of the opinion that these complainants were not guilty of such laches as would bar them from relief in this court. If the principle applicable in cases involving the pirating of trade-marks is consulted, this is clearly so with respect to the right to injunctive relief. For in such cases it is held that though the facts may show laches such as to defeat the right of the complainant to an account or a decree for gains and profits, the same facts will not necessarily avail to deprive him of his right to an injunction against future infringement. *McLean v. Fleming*, 96 *U. S.* 245, 24 *L. Ed.* 828; *Menendez v. Holt*, 128 *U. S.* 514, 9 *Sup. Ct.* 143, 32 *L. Ed.* 526; *Saxlehner v. Eisner & Mendelson Co.*, 179 *U. S.* 19, 21 *Sup. Ct.* 7, 45 *L. Ed.* 60; *Low, et al., v. Fels*, (*C. C.*) 35 *Fed.* 361; *Fairbank Co. v. Luckel Co.*, (*C. C.*) 106 *Fed.* 498; *Worchester Brewing Corp. v. Reter & Co.*, 157 *Fed.* 217, 84 *C. C. A.* 665; *International Silver Co. v. Rogers Corp.*, 66 *N. J. Eq.* 119, 57 *Atl.* 1037, 2 *Ann. Cas.* 407.

Not only do the facts of this case fail to present a situation evolving such laches as will consitute a bar to injunctive relief, but they also fail to raise such a bar to the claim for compensation for the damage done to the goodwill which the defendants had sold.

The cases of *Smith v. Brown*, 164 *Mass.* 584, 42 *N. E.* 101; *Fries v. Parr*, (*Sup.*) 139 *N. Y. Supp.* 220; and *Scarisbrick v. Tunbridge*, 3 *Eq. Reports*, 1853-55, cited by the defendants contain nothing in conflict with the views herein expressed. If the law as laid down in those cases be conceded, their facts clearly distinguish them from the case now before me.

I understand from the briefs and argument of the solicitors for the defendants, that if the court be of the opinion that the defendants have breached their agreement, and the complainants as partners are entitled to complain thereat and are not barred by reason of laches, or by the practical construction the parties have given to the contract by their conduct, it is conceded that an injunction may properly issue. But it is strenuously urged that the court cannot in granting injunctive relief at the same time decree damages.

If the court has properly comprehended the position of the defendants on this point, it is two-fold: First, that in such cases as this the aggrieved party cannot have two remedies, one by way of injunction and the other by way of damages; that he must elect which of these two forms of satisfaction he will take; and second, if he can be allowed both remedies, he can have only his injunction in this court and must resort to law for his damages. The latter proposition was not so pointedly insisted on as the former. Indeed, I am not quite certain that the defendants intended to rely upon this proposition at all, so casually was it mentioned in the argument.

First. Must the complainants elect between an injunction and a remedy for damages? If they are required to so elect then it must be because there is an inconsistency in reason between the allowing of both remedies for the same grievance. The agreement involved in this case was in substance that the defendants would not enter generally into competition with the good will which they sold. The agreement, unlike most agreements of this character, did not contain the usual clause naming a sum as liquidated damages for its breach. This circumstance is of importance, for if the parties had named a sum which they considered as the full measure of the damages which a future breach would occasion, it is obvious that it would be contrary to all reason to allow the injured

party to enjoin the breach and at the same time to collect the sum which he had agreed would amply compensate him for his injury. In such case he would preserve to himself all the benefits of the contract as a thing of continuing life and take from his adversary full compensation for its destruction. These two positions would be incompatible.

In *Bailey v. Collins*, 59 *N. H.* 459, where a contract of a nature similar to this one was involved, similar I mean with respect to the absence of a clause for liquidated damages, a motion was made that the complainant be required to elect between a bill in equity for an injunction and a suit at law for damages. The Supreme Court, in denying the motion, said:

"There is no incompatibility in the maintenance of a suit at law to recover damages already sustained, and the enforcement at the same time, by injunction, of the contract, which the defendants are continually violating. The one procedure affords compensation for an injury, * * * the other prevents its repetition; and in the case of the violation of an express contract, the plaintiff is not required first to establish his right at law. *Foote v. Linck*, 5 *McL.* 616. There is a manifest distinction between such a case, and one where the injunction is sought on the ground of repeated trespasses or nuisances. *Burnham v. Kempton*, 44 *N. H.* 78.

"The plaintiff, therefore, ought not to be required to elect between the two remedies, since the object sought in each is not the same, and the remedy in neither, of itself, sufficient."

If the complainants are compelled to confine themselves to only one of the two remedies, it is very plain that justice would be denied them. For if the injunction alone were granted, while future depredations on their business would thereby be safeguarded against, compensation for past injury, however great it may have been, would be surrendered; and if damages alone were awarded, though they could adequately compensate for the past, they must necessarily be in great danger of supplying inadequate compensation for the future, because of the manifest impossibility of forecasting it. In an action for damages, being for breach of an entire contract, the damages would be entire and in full for all time. An election between remedies, in such cases as this, would place the aggrieved party in a great dilemma and subject him in any contigency to an unjust hardship. The defendants have no right by their own wrongdoing, to drive him to such an hazardous election.

Mr. Pomeroy, in the first volume of his work on *Equity Jurisprudence*, (*3d Ed.*) § 237, instances cases of waste, nuisance and continuous and irreparable trespass where courts of equity have recognized the inadequacy of the single remedy of damages to afford proper relief and have accordingly afforded additional remedy by way of injunction. Patent and trade-mark cases also supply further examples of how courts have afforded injunctive relief against future, and allowed compensation for past, injuries. I can find no precedent in the authorities, nor can I discover any principle in reason, for holding that in cases of the kind now before me, injunction cannot issue against the future and the party at the same time allowed to obtain compensation for the past.

The case of *Bailey v. Collins, supra,* is sound in its reasoning. In line with it are *Patterson v. Glassmire,* 166 *Pa.* 230, 31 *Atl.* 40; *Stoffelt v. Stofflet,* 160 *Pa.* 529, 28 *Atl.* 857; *Swanson v. Kirby, et al.,* 98 *Ga.* 586, 26 *S. E.* 71; *My Laundry Co. v. Schmeling,* 129 *Wis.* 597, 109 *N. W.* 540.

In 2 *Elliott on Contracts,* § 856, is found the following:

"Injunction is not the exclusive remedy. It has been held that one may maintain an action to recover damages for alleged breach of a reasonable contract in restraint of trade, and also to enjoin further breach thereof."

And in *Joyce on Injunction,* § 473, it is said:

"In an equitable action, upon the establishment of plaintiff's right to have the defendant restrained from violating his agreement not to engage in a certain business, the court may, in order to do complete justice in the matter, and render unnecessary a resort to an action at law, award damages on account of the violation of said agreement during the litigation."

Mr. Bispham in his *Principles of Equity,* (*9th Ed.*) § 478, states:

"Where an injunction is granted the court will decree on account of the damages suffered as incidental to the main relief. This appears to be the settled rule both in England and in this country."

The following English authorities are cited by the defendants as sustaining the proposition that in such cases as this, the plaintiff cannot obtain relief, by way of injunction and also satisfaction by way of damages. *Scott v. Macintosh,* 1 *Ves. & B.* 503, 35 *Eng. Reprint,* 196; *Sainter v. Ferguson,* 1 *Mac. & G.* 286, 41 *Eng. Re-*

*print*, 1275; *Fox v. Scard*, 33 *Beav.* 327, 55 *Eng. Reprint*, 394; and *Hogg v. Kirby*, 8 *Ves.; Jr.* 215. But these cases upon examination will be found not to be in conflict with the views herein expressed.

In *Scott v. Mackintosh, supra*, it appears that the complainant had sued at law and had taken out the sum of seven hundred and fifty pounds which had been paid in by the defendant, I presume, though the report is silent upon the point, as damages for the breach of the contract. Later a bill, praying an injunction against future competition and seeking to restrain the defendant ·from proceeding at law for the installments remaining due on the contract of sale, was filed. Upon the right of the complainant to revive an injunction, pending an appeal against an order of the Master of the Rolls sustaining the defendant's answer after exception, Lord Eldon denied the right, the injunction being simply to restrain the defendant from proceeding at law to collect the balance of the purchase price. It may well be that the taking out of the seven hundred and fifty pounds in the action for breach of contract can be said to have constituted entire satisfaction for the breach of the contract, as would seem, from his remarks, to have been the view of the Lord Chancellor. His observation at the close of the case, that he did not recollect an instance of a bill for an account upon a covenant not to carry on a particular trade and that the usual course was a bill of discovery for the purpose of an action, at the most is only a dictum.

The later case of *Hogg v. Kirby, supra*, was also before Lord Eldon. That case was a bill by the publisher of a magazine against another publisher who was charged with imitating the publication of the former. It sought both an injunction and an account. If the case be regarded as relevant to the principle involved in the instant case, then the following language of the Chancellor would operate against the contention of the defendants:

"* * * and therefore the remedy here, though not compensating the pecuniary damage except by an account of profits is the best; the remedy by an injunction and account."

*Sainter v. Ferguson, supra*, is clearly distinguishable from the pending case, because of the fact that the contract involved in that case was held to contain a provision for a sum as liquidated

damages in the event of a breach. The complainant had recovered the sum named in an action at law and then sought an injunction. Lord Chancellor Cottenham said:

"It comes in fact, to this—that after the defendant has paid the price of doing the act, the court is asked to restrain him from doing that act for which he has paid."

The injunction was not, therefore, allowed.

In *Fox v. Scard, supra,* the Master of the Rolls, approving the rule laid down in *Sainter v. Ferguson, supra,* held on demurrer to a bill for an injunction, that where the contract to abstain from competition contained a penalty for its breach, the aggrieved party was not compelled to sue at law, but had a right to waive his claim to money compensation and to seek relief in equity by way of injunction.

The foregoing English cases are the only cases to which I have been referred as sustaining the view of the defendants. They seem to me not to be in conflict with the authorities to which I have heretofore referred as sustaining the right of the complainants to have an injunction against future depredations on their business and compensation for injury done in the past.

Second. This being so, can a court of equity grant both remedies? It is elementary that a court of equity, when once it acquires jurisdiction, may proceed with the cause to the administering of full relief. The reason for the rule is the desirability of the avoidance of a multiplicity of suits. While Chancery will not entertain suits looking solely to damages, yet where a case of clearly equitable cognizance is presented, the court, if damages be necessary in order to do complete justice, will as incidental to the main relief decree such damages. This principle is exemplified not alone in the cases hereinbefore cited, but as well in cases of waste, continuous and irreparable trespass, certain cases of nuisance and, under peculiar circumstances, in cases of specific performance of contracts for the sale of land. I do not deem it necessary to elaborate the point. For the case of *McDowell v. President, etc., Farmers' Bank,* in the Court of Errors and Appeals in this State, reported in 1 *Harr.* 369, is conclusive of the question.

Having thus determined that the complainants are entitled

not alone to an injunction, but as well to damages, the next inquiry is, how shall the damages be ascertained?

In the case of *McDowell v. President, etc., Farmers' Bank*, just cited, the court, though it held it could send an issue to law to have the damages assessed, nevertheless in view of the simplicity of the problem before it, proceeded itself to assess them. Under our modern procedure, the court if it deem it best, could also refer the question to a master.

In the case before me, the damages range from a nominal sum to as high as twelve thousand dollars, which is the sum contended for by the complainants. They are typically unliquidated in character. Being such they fall peculiarly within the province of a jury to ascertain. Mr. Justice Story in his work on *Equity Jurisprudence,* (14th Ed.) § 1084, in speaking of compensation and damages in connection with injunctions, says:

"The mode by which such compensation or damages are ascertained is either by reference to a master or by directing an issue, *quantum damnificatus*, which is tried by a jury. The latter used to be almost the invariable course, in former times, in all cases where the compensation was not extremely clear as to its elements and amount; and this course is still commonly resorted to in all cases of a complicated nature. But the same inquiries may be had before a master; and in cases where such inquiries do not involve much complexity of facts or amounts, this course is now often adopted."

Chancellor Kent, in *Phillips v. Thompson*, 1 *Johns. Ch.* (*N. Y.*) 131, 151, says:

"The cases are numerous in which the Court of Chancery has caused damages to be assessed, either by an issue or by a master, at its discretion. [Citing cases.] I believe the more usual course, where the damages are not a matter of mere computation, is by awarding an issue, and, under the circumstances of this case, I deem it the more advisable method."

In *Moore v. Martin*, 1 *B. Mon.* (*Ky.*) 97, 99, the court said:

"The assessment of unliquidated damages for services rendered, falls more appropriately within their [jury's] province; is more consistent with the genius of our institutions, and would likely be more satisfactory to the parties."

The matter of the ascertainment of damages, of the kind here sought to be awarded, ought not to be passed upon by the Chancellor alone, unaided by the assistance of a jury, nor by a master. I am persuaded that the wise course to pursue is to seek

the judgment of a jury at the bar of the Superior Court upon the question of the amount of damages.

The injunction should issue as prayed, and an issue, *quantum damnificatus*, directed to the Superior Court, sitting in and for Kent County, to assess the damages down to the date of the injunction.

A decree and order will be prepared in accordance with the views herein expressed.

Note: On appeal the decree entered in accordance with this opinion was affirmed. See *post p.* 402.