WALTER EARL TUBBS and MILDRED EDNA TUBBS, his wife, and FREDERICK B. MONSELL and THELMA H. MONSELL, his wife,

*vs.*

HERBERT J. GREEN and ELLA M. GREEN, his wife.

*New Castle, October 15, 1947.*

152

*George Gray Thouron* and *John P. Sinclair*, of the firm of Southerland, Berl & Potter, for complainants.

*Morris Cohen*, of the firm of Cohen & Cohen, and *Thomas Herlihy, Jr.*, for defendants.

SEITZ, Vice-Chancellor: The court is called upon to determine the enforceability of certain restrictive covenants contained in a deed to real estate.

Complainants, Mr. and Mrs. Tubbs and Mr. and Mrs. Monsell (hereafter referred to as "complainants" unless further identification is necessary) as the owners of resi-

dences in a development known as Wilmington Manor, seek an injunction against the defendants, Mr. and Mrs. Green, to prevent them from erecting a store, allegedly in violation of certain restrictive covenants, on certain lots owned by the Greens in the same development.

The problem confronting the court can best be understood by examining the history of the land which now constitutes the development known as Wilmington Manor.

Prior to 1927 the land constituted a farm owned by Joseph B. Stahl. In 1927 the farm was sold to the Koch Corporation subject to a purchase money mortgage. At that time, a plot was put of record by the Koch Corporation dividing the property into building lots. Only a very few lots were sold by the Koch Corporation, and the deeds for those sold did not contain any uniform set of residential building restrictions. Parenthetically, certain references herein to the number of lots involved at various times may well show some minor inconsistencies. These inconsistencies result from the fact that the testimony thereon was largely from memory, rather than from records. However, both sides agreed that I might rely on such testimony and this I have done, since the inconsistencies do not affect the result.

Sometime in 1931 or 1932 Joseph Stahl foreclosed the Koch Corporation's mortgage and repurchased the property at sheriff's sale. Mr. Stahl held the property until August 23, 1937. During this period he sold a few lots, but once again the deeds for the lots sold did not contain any uniform residential restrictions.

On August 23, 1937, Stahl conveyed to Wilmington Manor, Inc. all of the lots owned by him and known as Wilmington Manor under the 1927 plot. From this date until the imposition of the so-called Jensen restrictions on September 14, 1941, Wilmington Manor, Inc. sold about 20 or 30 lots. However, the deeds for most of these lots contained the so-called Pinder restrictions, or restrictions

against mercantile use.  The Pinder restrictions here pertinent provide:

"1.  All lots in the tract shall be residential lots and no structure shall be erected other than detached single family dwellings not to exceed two stories in height and one or two car garages.

"2.  No building shall be erected nearer than twenty-five feet to nor farther than thirty-five feet from the front lot line nor nearer than five feet to any side lot line.  The side line restriction shall not apply to a garage located on the rear one quarter of the lot except that on corner lots no structure shall be permitted nearer than eight feet to the side street line.

"3.  No residential lot shall be sub-divided into building lots having less than five thousand square feet of area nor a width of less than fifty feet nor shall any building be erected on any residential building plot having an area of less than five thousand square feet or a frontage of less than fifty feet.

\*   \*   \*   \*   \*   \*

"12.  That no building shall be erected on these premises unless the location, type of structure and architectural design shall have first been submitted to and approved by Wilmington Manor, Inc.

"13.  These covenants and restrictions are to run with the land and shall be binding on all parties, and all persons claiming under them until January 1, 1969, at which time said covenants and restrictions herein contained, or any portion thereof, may be extended for additional periods of time by making appropriate provisions therefor.

"14.  If the parties hereto, or any of them, or their heirs or assigns, shall violate or attempt to violate any of the covenants or restrictions herein before January 1, 1969, it shall be lawful for such person or persons owning other lots in said development or sub-division to prosecute any proceedings at law or in equity against the person or persons violating, or attempting to violate any of such covenants or restrictions and to prevent him or them from so doing."

Sometime in 1941, Federal Housing Administration financing was procured, but in order to protect its investment the F. H. A. required Wilmington Manor, Inc. to place a uniform set of restrictions on all lots owned by it.  This was done through a conveyance of the lots to a Miss Jensen who reconveyed the lots to the corporation pursuant to a recorded deed which contained the so-called Jensen restric-

tions. The Jensen restrictions are substantially the same as the Pinder restrictions with three principal differences. The Jensen restrictions set aside certain commercial and recreational areas, while the Pinder restrictions did not, the Jensen restrictions permitted two and one-half story houses rather than two story houses, and the Jensen restrictions fixed a minimum side lot area, while the Pinder restrictions did not.

After the placing of the Jensen restrictions the corporation reacquired about a dozen lots in order to readjust the size of some of the lots in the development. As stated, only about 40 lots had been sold in the entire development up until 1941, and only about 10 houses erected. After the Jensen restrictions were placed of record and F. H. A. financing procured, the development, consisting of about 800 lots, grew until there are now over 400 homes in the development.

The complainants and defendants own lots in the same block. The Monsells purchased lots one-half of 22, 23, and 24 in block 4 from Charles Virden on October 15, 1946. This property was subject to the Pinder restrictions. The Tubbs own lots one-half of 32, 33 and 34 in block 4 which they purchased on October 1, 1941. Their deed contains the Jensen restrictions. Defendants purchased lots 25, 26, and one-half of 27 in block 4 on January 24, 1946, subject to the Pinder restrictions. Subsequently, the defendants acquired the other half of lot 27, but since the alleged violation of the restrictions is not taking place on any portion of lot 27, I shall not discuss it.

The restrictions on the lots owned by the complainants and defendants were imposed originally by Wilmington Manor, Inc.

On June 26, 1947, excavation work was commenced on lots 25 and 26 of the defendants' property for the purpose of erecting a building designed to consist of a grocery store

on the first floor and two apartments on the second floor. This suit was filed on July 11 and on the same date a restraining order was issued without objection restraining further work pending the disposition of the matter. The case was submitted for decision on oral testimony, numerous stipulations, and a view of the development by the court.

The complainants assert that the following three restrictions contained in the Pinder deed to the defendants have been violated:

1. A provision that only a single family residence building shall be built.

2. A provision that buildings must be set back 25 feet from the front lot line.

3. A provision that plans for construction must be submitted to and approved by Wilmington Manor, Inc.

All of these restrictions appear in the defendants' deed, and all of these restrictions have been violated by the defendants.

The defendants assert four defenses to the attempt by the complainants through this action to enforce the restrictions contained in the defendants' deed. They are (1) the lack of a uniform residential plan in Wilmington Manor, (2) laches on the part of the complainants, (3) unclean hands and lack of reciprocity, and (4) balance of convenience.

The defendants first contend that no uniform residential plan existed until the Jensen restrictions were placed in 1941, and that those restrictions only apply to lots covered thereby. Since the Pinder restrictions on their property were imposed prior to the Jensen restrictions, they conclude that they are not bound. They further contend that, in any event, no uniform residential plan now exists in block 4 and the area immediately adjacent thereto.

Before determining as of what time the court should

test for the existence or nonexistence of a residential plan and whether such plan, if existent, would include the defendants, it becomes important to consider just what the law requires before a residential plan can be said to exist.

The question of the creation of a residential plan was recently mentioned by this court in *Jackson v. Richards*, 26 *Del. Ch.* 260, 266, 27 *A.* 2d 857, 859. There it was said:

"In most cases, where an owner of a tract of land lays it out in building lots, makes a plot showing a general building scheme, and sells to various purchasers in accordance therewith, inserting the same or similar covenants in all the deeds, it seems that an intent to benefit all the land in the tract and to induce purchases thereby may be inferred. * * * Whether, however, there was such a general and uniform plan of sale, pursuant to which the complainant's lot was sold, is ordinarily, a question of fact, to be determined from the circumstances."

As the solicitors for the parties state, a residential plan may be created in several ways, one of which is where the seller pursues a course of conduct indicating a neighborhood plan, leading the several purchasers to assume its adoption and the adherence of all owners to it by such conduct. See *McComb v. Hanly*, 132 *N. J. Eq.* 182, 26 *A.* 2d 891, 144 *A.L.R.* 912.

Let us look then to the facts to see whether or not the owners of Wilmington Manor pursued a course of conduct indicating a neighborhood plan. This can best be accomplished by considering the history of this development.

In 1927, a plot was put of record by the Koch Corporation dividing the property into building lots. Only a very few lots were sold by the Koch Corporation, and the deeds for those sold did not contain any uniform set of residential building restrictions. Sometime in 1931 or 1932 Joseph Stahl foreclosed the Koch Corporation's mortgage and repurchased the property at sheriff's sale. Mr. Stahl held the property until August 23, 1937. During this period he sold a few lots, but once again the deeds for the lots sold did not contain any uniform residential restrictions.

It is fair to state, therefore, that while a residential plan might have been contemplated, no intent on the part of the owner to create a residential plan for Wilmington Manor could have been inferred as of August 23, 1937.

Wilmington Manor, Inc. took over the development in 1937. Up to that time, as stated, the previous owners had sold a few lots without residential restrictions, but so far as the evidence indicates, none had been put to nonresidential use. It seems important, therefore, to decide whether those scattered sales of unrestricted lots prior to 1937 prevented Wilmington Manor, Inc. from thereafter creating a residential plan in the development. The solicitors for the parties have cited no authorities touching on this point. Because of the insignificant number of sales made prior to the acquisition of the development by Wilmington Manor, Inc. in 1937, when compared with the size of the development, and because the evidence failed to show any nonresidential use of such lots, I conclude that it was legally possible for Wilmington Manor, Inc. in 1937 to set out to create a residential plan by the use of appropriate restrictions in its deeds, and that such intent, if it existed, would not be frustrated because of a few unrestricted sales in the development by the previous owners. Compare *LaFetra v. Beveridge*, 124 *N. J. Eq.* 24, 199 *A.* 70.

Between 1937 and 1941 Wilmington Manor, Inc. sold about 20 or 30 lots and the deeds for most of those sold contained either the quoted Pinder restrictions, or the nonmercantile restrictions. Moreover, up to 1941 there was no nonresidential use of any of the lots theretofore sold. Thus, looking at the sales made by Wilmington Manor from 1937 to 1941, I feel it reasonable to conclude that the owner, by incorporating the Pinder restrictions or the nonmercantile restrictions in the deeds to practically all of the properties sold during that period, intended to initiate a substantially uniform residential plan.

When the Jensen restrictions were imposed in September 1941, any question as to the intention of the owner

was removed. The imposition of the Jensen restrictions had the effect of imposing residential restrictions on over 750 of the 800 lots in the development. I conclude that the course of conduct of Wilmington Manor, Inc. in incorporating residential restrictions in the deeds to most of the properties sold up to the date the Jensen restrictions were imposed, plus the act of restricting the balance of the development by the Jensen restrictions, evidenced an intent to create a residential plan.

It is at once clear, as the defendants indicate, that there is no universal application of residential restrictions to Wilmington Manor. It, therefore, becomes necessary to decide as a matter of law whether this court will recognize the existence of a plan which is not universally restricted but substantially so.

The complainants rely on several cases which recognize that restrictions will be enforced where there has been a substantial, but not necessarily a universal application of residential restrictions to lots of like character and where the lots have been used for the purpose designated. See *Velie v. Richardson,* 126 *Minn.* 334, 148 *N.W.* 286; *Frink v. Hughes,* 133 *Mich.* 63, 94 *N.W.* 601.

Defendants rely upon the statement of law as it appears in the New Jersey Court of Errors and Appeals case of *Scull v. Eilenberg,* 94 *N. J. Eq.* 759, 762, 121 *A.* 788, 789:

"A neighborhood scheme of restrictions to be effective and enforceable must have certain characteristics. It must be universal, that is, the restrictions must apply to all lots of like character brought within the scheme. Unless it be universal it cannot be reciprocal. If it be not reciprocal, then it must as a neighborhood scheme fall, for the theory which sustains a scheme or plan of this character is that the restrictions are a benefit to all. The consideration to each lot owner for the imposition of the restriction upon his lot is that the same restrictions are imposed upon the lots of others similarly situated. If the restrictions upon all lots similarly located are not alike, or some lots are not subject to the restrictions while others are, then a burden would be carried by some owners without a corresponding benefit. 'The burden follows the benefit,' as was said by Judge White in the

case of *Sanford v. Keer*, 80 *N. J.* 240. When there is no benefit there should be no burden. If the benefit be destroyed the burden should end."

I cannot believe the New Jersey court meant literal universality because such a conclusion was not even necessary to the decision on the facts there present. Moreover, the recent New Jersey Court of Errors and Appeals case of *LaFetra v. Beveridge, supra,* would appear to indicate to the contrary.

In any event, I prefer the view, as set forth in the cases cited by complainants, that there need exist only a substantially uniform residential plan in order for a court to enforce a covenant such as is here involved. I reach this conclusion because the enforcement of such restrictions when there is a substantially uniform residential plan, tends to secure the benefits for which such schemes are created, namely, protection of residential investment and enjoyment. Since such objectives are recognized as being legitimate in our present society, I see no need to permit an insubstantial number of exceptions to or violations of the restrictions to be used as the basis for rendering the entire development free from residential restrictions, and thus defeat such legitimate objectives. See *Hooker v. Alexander,* 129 *Conn.* 433, 29 *A.* 2d 308. Certain language of this court in *Rogers v. Zwolak,* 12 *Del. Ch.* 200, 110 *A.* 674, would appear to support my conclusion. The rights of purchasers as well as the owner of the development must be recognized, and the enforcement of a substantially uniform residential plan supplies that recognition.

Was there a substantially uniform residential plan created in Wilmington Manor? I believe that such a plan had evolved at least when the Jensen restrictions were imposed on September 14, 1941. At that time, the land in the development—with exceptions which I shall discuss under the argument that no residential plan now exists—was overwhelmingly subject to residential restrictions, and there was little if any nonresidential use of the unrestricted lots.

Moreover, in my opinion, for our purposes, the Pinder and Jensen restrictions may be treated alike. The differences between the two sets of restrictions relate to the number of stories, the side lot area and the setting aside of commercial and recreational areas, and while perhaps important for some purposes are not of such a degree as to take them outside the orbit of reasonable requirements for a residential plan for this development. Otherwise stated, the differences are within the ambit of reasonable tolerance in residential use.

Defendants contend that the residential plan, in order to bind them, must have existed at the time the Pinder restrictions were originally imposed on their property when it was purchased by a predecessor in title in January 1941. According to defendants, whatever uniformity was supplied by the Jensen restrictions cannot bind them because their rights were fixed when the Pinder restrictions were imposed in January 1941. Implicit in the very creation of a residential plan by the practice of inserting residential restrictions in deeds is the fact that the plan evolves and does not immediately burst into full bloom. Therefore, I cannot agree that restrictions imposed subsequent to the date of those imposed on defendants' property may not be considered in determining whether a residential plan was created. Especially is this true here, since the restrictions to be tested, for the purposes of deciding whether or not a plan existed, were all imposed by the owners of the development.

Defendants point to certain unrestricted lots in the development, but it is stated in their brief that this is done only to show that there was "no reciprocal obligation by virtue of the Pinder deed (and similar deeds) to impose the same restrictions on other properties." Must such an understanding appear in each deed executed by the owner of the development, or is it sufficient that, with insubstantial exceptions, the corporation did render the development sub-

ject to such restrictions? I conclude that it is sufficient for the owner to incorporate restrictions in the deeds for substantially all properties sold, and that such deeds need not contain an undertaking to incorporate the same restrictions in all other deeds. Support for my conclusions on this precise point is found in the New Jersey Court of Chancery case of *DeGray v. Monmouth Beach Club House Co.*, 50 *N. J. Eq.* 329, 24 *A.* 388, affirmed 67 *N. J. Eq.* 731, 63 *A.* 1118. See also *Nottingham Patent Brick and Tile Company v. Butler,* 15 *Q. B. Div.* 261, affirmed (C.A.) 16 *Q. B. Div.* 778. Where the residential plan is based on a course of conduct by the seller in placing restrictions in deeds, the reciprocity exists in the similar burden and benefit received by other purchasers.

Since I have concluded that defendants' property forms a part of an integrated residential plan, it follows that the restrictions in the defendants' deed may be enforced unless, as defendants contend, no residential plan now exists in block 4 and the area immediately adjacent thereto. In order to resolve this contention, I shall first reconstruct the situation in block 4 of Wilmington Manor and the surrounding blocks as of the time this suit was instituted on July 11, 1947.

It will be apparent that some of the factors treated in the subsequent discussion existed during the period when —as I find it—a residential plan was created. To that extent, I have already decided that their existence did not defeat the creation of the plan. However, a more detailed treatment of some of those factors is required because the cumulative effect of the evidence becomes important in determining whether a residential plan still exists.

As an aid to the subsequent discussion, I shall set forth a sketch showing most of the portions of Wilmington Manor pertinent to our problem here.

| 17 | | 44 | 17 | | 44 |
| 16 | | 45 | 16 | | 45 |
| 15 | | 46 | 15 | | 46 |
| 14 | | 47 | 14 | | 47 |
| 13 | (29) | 48 | (30) 13 | | (31) 48 |
| 12 | | 49 | 12 | | 49 |
| 11 | 20 | 20 50 100 | 100 11 20 | 20 | 50 |
| 8 9 10 100 | | 100 1 2 3 4 5 6 7 8 9 10 | 10 100 | 100 | 1 2 3 |
| " " 20 | | 20 " " " " " " " " 20 | | 20 | " " |

**PENNSYLVANIA AVE.**

| " " 20 | | 20 " " " " " " ". " . " 20 | | 20 " " |
| 27 26 25 100 | | 34 33 32 31 30 29 28 27 26 25 100 | | 34 33 32 |
| 24 20 | | 35 20 | 24 20 | | 20 35 |
| 23 | | 36 | 23 | | 36 |
| 22 | | 37 | 22 | | 37 |
| 21 | | 38 | 21 | | 38 |
| 20 | | 39 | 20 | | 39 |
| 19 | | 40 | 19 | | 40 |
| 18 (5) | | 41 | (4) 18 | | (3) 41 |
| 17 | | 42 | 17 | | 42 |
| 16 | | 43 | 16 | | 43 |
| 15 | | 44 | 15 | | 44 |
| 14 | | 45 | 14 | | 45 |
| 13 | | 46 | 13 | | 46 |
| 12 | | 47 | 12 | | 47 |
| 11 20 | | 20 48 100 | 100 11 20 | 20 | 48 |
| 8 9 10 125 | | 135 1 2 3 4 5 6 7 8 9 10 | 125 20 | 125 | 1 2 3 |
| " " 20 | | 20 " " " " " " " " " 20 | | 20 | " " |

ROOSEVELT AVE.

VANBUREN AVE.

**DUPONT BOULEVARD**

In Block 4 lots 1 to 10 and 48 are subject to no residential restrictions. Lots 11 to 15, part of 17, 18 to 26, and one-half of 27 are under the so-called Pinder restrictions. Lots 16, part of 17, one-half of 27, and 28 to 47 are all subject to the Jensen restrictions. Thus, all lots in block 4, except 1 to 10 and 48, are restricted to residential use.

It may be noted at once that except for lot 48, all of the unrestricted lots in block 4 face on the DuPont Boulevard —a main highway running roughly north and south through the development. When Wilmington Manor, Inc. came to set up the Jensen restrictions at the behest of F. H. A., it was required to set aside certain areas for "recreational" and "business" districts. In the business districts, business establishments could be erected without violating the general restrictions. These business districts, according to the recorded plan, were lots numbers 1 to 10, inclusive, of block 8, lots numbers 1 to 10, inclusive, of block 7, and lots numbers 1 to 7, inclusive of block 1.[1]

An examination of the plot shows that all lots set aside for business purposes face on the DuPont Boulevard and are located on the same side thereof as lots numbers 1 to 10, inclusive, of block 4. In fact, blocks 1 to 11, inclusive, all are located on the west side of the DuPont Boulevard. Each block abuts on the highway and the numbers run consecutively with block number 1 being most northerly.

Since it is apparent that the F. H. A. required a complete community lay out, I think we may assume that the persons constructing the plan took into effect the fact that, since lots 1 to 10 of block 4 were unrestricted, and did not then belong to the corporation, they might be used for purposes other than residential. The other business districts were apparently selected to conform to this possibility.

---

[1] Apparently lots 95 to 98, inclusive, in Section E were reserved for business purposes in an earlier plot. This appears from a plot put of record by the corporation on February 19, 1941. These lots are on the east side of the highway and face thereon, and so fit into the general pattern of business areas.

I conclude, therefore, that the fact that lots numbers 1 to 10, inclusive, of block 4 are not restricted does not serve to defeat the existence of a residential plan at this time.

The only other unrestricted lot in block 4 is lot 48 which faces on Roosevelt Avenue and adjoins the rear line of lots 1 to 5, which face on the DuPont Boulevard. Since this lot had been sold by Joseph Stahl in 1936, Wilmington Manor, Inc. obviously was in no position to impose restrictions on it when they later came to impose the residential restrictions.

Of real importance is the fact that lots 1 to 7,[2] inclusive, and lot 48 all belong to the Board of Missions of the Methodist Church, Inc. A church now stands on lots 1 to 7 and faces on the highway. I do not feel that the general use of these lots for a church, especially when coupled with its location, is sufficient to warrant the conclusion that the neighborhood plan or scheme has failed.

Lot 48 also belongs to the church but it contains no structure, and does not now constitute a deviation from the residential scheme. Lots 8 to 10 also face on the highway and, while unrestricted, do contain a private residence. With the exception of lot 48, which is not significant because it is vacant, all the lots in block 4 which face on one of the three streets other than the highway, are subject either to the Pinder or the Jensen restrictions, which are here treated as the same.

At the present time, there is no nonresidential use in block 4 except the church which, to my mind, does not. here defeat the residential plan. I conclude, therefore, that a substantially uniform plan of residential development existed in block 4 when this action was instituted.

It becomes pertinent next to examine the restrictions on the lots in the blocks facing block 4.

---

[2] It is not clear from the evidence whether the church owns all or only one-half of lot 7. The point is not important.

The north side of block 4 and the south side of block 3 face each other on VanBuren Avenue. One-half of lot 39 and all of lots 40 to 46, inclusive, in block 3 face on VanBuren Avenue, and their use is not now restricted to dwellings. However, these lots constitute a landscaped lawn for a private residence. All the other lots in block 3 facing on VanBuren Avenue are restricted to residential use. Thus, while certain lots are not subject to residential restrictions they are in fact being used for residential purposes, and when so viewed are obviously consistent with the conclusion that the substantially uniform residential plan subsists.

The south side of block 4 and the north side of block 5 face each other on Roosevelt Avenue. The use of the lots in block 5, including those facing on Roosevelt Avenue are not restricted to dwellings. The block was never owned by Wilmington Manor, Inc. It contains only a farm house converted into a dwelling. The rest of the block is either landscaped or open field. At this time its use is consistent with the residential pattern.

The west side of block 4 and the east side of block 30 face each other on Pennsylvania Avenue. Lots 1 to 5 in block 30 are restricted while lots 6 to 10 in block 30 are not restricted. A store has very recently been erected on lots 6, 7 and one-half of 8. The other half of lot 8, and lots 9 and 10 contain a private residence.

There is no indication at this time that the lots facing block 4 which are not restricted to dwellings will be used in such a way as to defeat the substantially uniform plan of residential development. In fact, many of them are now committed to residential use. The one notable exception is the store being erected on unrestricted lots directly across the street from the property owned by the defendants. This use is obviously inconsistent with the general residential plan, but I cannot bring myself to believe that its existence should be considered as constituting the basis for inferring that the residential plan has failed, especially in another block.

From my view of the development and from the other evidence, I conclude that the deviations from the residential plan are not of such substance as to warrant the conclusion that the plan is legally dead. On the contrary, I find that a substantially uniform residential plan existed in block 4 and the area immediately adjacent thereto at the time this suit was filed and proof adduced.

Defendants assert that the complainants are not entitled to relief because they are guilty of laches. The excavation work on the structure was commenced on June 26, 1947. Almost immediately thereafter one of the complainants consulted an attorney with respect to his rights. The complainants, within a few days, instructed their attorney to notify the defendants to cease violation of the restrictions in their deed. This the complainants' attorney did by letter dated July 3, 1947, which the defendant testified he received on July 7. This suit was commenced on July 11. Defendants contend that the complainants should have made known their objections sooner than they did and should have instituted suit at an earlier date. Under the facts of this case, I am unable to agree that the complainants delayed acting for an unreasonable period of time. Compare *Scotton v. Wright,* 13 *Del. Ch.* 214, 117 *A.* 131, affirmed 13 *Del. Ch.* 402, 121 *A.* 69, 31 *A.L.R.* 1162.

Defendants next contend that the complainants, Tubbs, are not entitled to maintain this action because of certain conduct on their part, which allegedly subjects them to the doctrine of unclean hands. No such defense is asserted as to the Monsells. Consequently, this action could be maintained even though the defendants sustained this defense. I shall, therefore, not pass upon this defense.

The defendants once again assert that there is a lack of reciprocity between the complainants, Tubbs, and the defendants because the defendants' property is subject to the Pinder restrictions, while the Tubbs' property is subject to the Jensen restrictions. The reciprocity point has already

been disposed of in connection with the defendants' first contention. Moreover, the defense is here limited to some of the complainants. Consequently, it does not preclude the other complainants from maintaining this action.

We come to the defendants' fourth and final contention that under the doctrine of the balance of convenience the complainants should be denied equitable relief. Assuming, without deciding, that this doctrine may properly be considered under our facts, I nevertheless feel that the balance of convenience does not here preponderate in the defendants' favor.

We are not concerned with an attempted enforcement of restrictions appearing much earlier in a chain of title. Here, the very restrictions themselves appear in the defendants' deed. Moreover, defendants had an attorney search the title to these lots when they purchased them in 1946. True, the defendant testified that his attorney never told him of the restrictions, but I do not see why complainants any more than defendants should suffer because of this omission by defendants' attorney.

It is also true that the defendants will be damaged by an injunction, but as I have said, complainants acted with all reasonable dispatch to assert their rights. Consequently, the defendants may not blame their damages on any unreasonable delay by complainants in asserting their rights.

The fact that the defendants found a considerable number of owners in the development—though a small proportion of the total—who were willing to see a store erected on the defendants' property cannot alter the results here. Compare *Rogers v. Zwolak, supra*. This is especially true in the absence of other weighty factors in support of the defendants' cause.

An injunction should issue restraining the defendants from violating the residential, setback, and plan approval restrictions contained in their deed.

A decree accordingly will be advised.