BROWNDALE INTERNATIONAL, LTD., Plaintiff and Respondent, v. BOARD OF ADJUSTMENT FOR THE COUNTY OF DANE, Defendant and Appellant: TOWN OF COTTAGE GROVE, Intervenor-Appellant.*

*No. 403. Argued May 2, 1973.—Decided June 18, 1973.*
(Also reported in 208 N. W. 2d 121.)

* Motion for rehearing denied, with costs, on September 10, 1973.

For the appellant there was a brief by *La Follette, Sinykin, Anderson & Abrahamson* and *A. Roy Anderson,* all of Madison, and oral argument by *A. Roy Anderson.*

For the intervenor-appellant there were briefs and oral argument by *Lloyd A. Schneider* of McFarland.

For the respondent there was a brief by *Richard C. Glesner, Robert D. Martin,* and *Ross, Stevens, Pick & Ross,* all of Madison, and oral argument by *Mr. Glesner* and *Mr. Martin.*

BEILFUSS, J. Dane county, for zoning purposes, is divided into 13 districts. Sec. 10.02 (1), Ordinance. The district in question is an A-1 agricultural district. Under sec. 10.12 (1) of the ordinance, certain "permitted uses" for an A-1 agricultural district are enumerated. Site approval is not required. One such "use" is a "single family detached dwelling unit." Under sec. 10.12 (2) of the ordinance other enumerated uses are also permitted but only upon first obtaining site approval.

Sec. 10.01 (18) (a) of the ordinance defines a "single family dwelling" as: "A building designed for and occupied exclusively as a residence for one family." Sec. 10.01 (19) defines "family" as: "Any number of in-

dividuals related by blood or marriage, or not to exceed five (5) persons not so related, living together on the premises as a single housekeeping unit, including any domestic servants." The basic issue in this action is whether a Browndale therapeutic home falls within the meaning and definition of a single family dwelling unit. If it does then the homes can be located in the area in question without site approval.

The nature of the Browndale therapeutic home and its intended purposes (for the care and maintenance of emotionally disturbed children) first requires an understanding of what Browndale International, Ltd., is, its history and what is its purpose. John L. Brown is the founder and president of this Canadian corporation. Mr. Brown is a psychiatric social worker by profession. He has worked with emotionally disturbed children since 1944. For several years he worked at the Warrendale Institution in Ontario. Over the years the institution changed over to a family model treatment center. In 1966, Mr. Brown started his own privately operated Browndale program. This program branched out into the United States. The program's purpose is to treat the disturbed children in the community. The method centers around the concept of normalizing a child's lifestyle as much like a child who has been living with his own family. It is a therapeutic family concept of care which attempts to duplicate the family life.

Browndale International, Ltd., itself is not the corporation engaged in the direct care and maintenance of these emotionally disturbed children; nor is it licensed by the state of Wisconsin as a child welfare agency. Rather, a state licensed corporation called "Involvement Centers, Wisconsin, Inc.," (hereinafter Involvement Center or Center) provides the care and operates these homes. The Involvement Center is licensed under sec. 48.60, Stats., as a child welfare agency. The places of care provided for the children are referred to by the

department of health and social services as "child welfare institutions" under its rules and regulations. The Involvement Center is a subsidiary or an affiliated corporation of Browndale International, Ltd.[2] The Involvement Center was incorporated in December of 1971 and consists of 15 stockholders, to wit: Browndale, Mr. Brown and his wife, two people from Arizona and Minnesota, two people from Ontario, and the senior staff of the Wisconsin operation.

The property in question consists of two adjacent pieces of land of about 182 acres located in an A-1 agricultural district in the town of Cottage Grove. This property is what precipitated the appeal. Browndale had contracted to purchase six homes located on this property. Of the six homes, one is already licensed and a permit was granted as of January of 1972. The reason Browndale contracted to purchase this property was so it could lease residences for profit to the Involvement Center. The Center intends to use the property for the purpose of establishing homes for "therapeutic families." It should be noted that Browndale is eventually planning to have 21 homes for 105 children in this state. There are already six homes in Dane county and another five homes are planned for the town of Cottage Grove. The number of children in each home varies from eight in the town of Fitchburg to four in the only home licensed and permitted in Cottage Grove. By contractual agreement, Browndale provides the facilities and furnishings for these buildings the Center leases. The rent per month depends on how many children are in each home unit. The amount varies from not less than $400 to not more than $1,000 per month. The lease provides that the Center pay all real estate taxes. The Center's source of income is a $37 fee for each child taken care of per day.

---

[2] Browndale International, Ltd., will be referred to as "Browndale."

The fee is paid by the county and the state. The one therapeutic home in Cottage Grove that is in "use" is not presently owned by Browndale. Rather, Browndale is renting the home from one Mr. Moe for $250 per month. Browndale then subleases it to the Center for $400 per month rent.

The initial operation for these therapeutic homes in Dane county began in September of 1971. The average stay for a child is fifteen months. The projected gross revenue for 1972 in Dane county (based on a planned 105 children in 21 homes) was somewhere between one to 1.3 million dollars. Mr. Brown testified that the net profit budgeted for the Browndale operation is estimated at three to six percent. But the record shows that the actual profit factor for 1972 turned out to be eight to 10 percent.

The emotionally disturbed children who are housed in these homes are neglected, dependent or delinquent. The children are involuntarily placed in these homes by the juvenile court. The purpose is for treatment and rehabilitation. However, once the child is placed there he is not forced to remain. The child, if he desires, can be relocated elsewhere. The four children presently at the Cottage Grove home ". . . are the 1% of the most disturbed children in the State." [3] The children need intensive and extensive care and treatment, and are under strict supervision. If they are able to, they attend area schools.

Each therapeutic home is staffed with the following personnel: Therapeutic parents who supervise the children and the program. They function as surrogates and are responsible for the child twenty-four hours a day.

---

[3] Mr. Brown testified that for some of these emotionally disturbed children it takes time before they become civilized. He added, ". . . You are trying to civilize them and teach them how to live in the community. . . ." Some children are very disturbed, difficult and suffer physical ailments.

They do not live there. There are no set hours of work; rather, the hours put in depend upon the pattern of life-style that they create for each home. Most importantly, the therapeutic parents are not supposed to identify to these children as their parents, nor act as substitutes for the biological parents, nor provide the children with a mother-father image. Mr. Brown's testimony is descriptive of their role:

"*Q.* Do the children identify with the therapeutic parents? In other words, do they refer to them as a father image?

"*A.* No, we don't use that because we have to remember that while we treat the child as though he were our own, because that is what he needs, he is not our own and we can't get back from him—he belongs to somebody else. He is somebody else's child, and so part of our work is to include the biological family as well. Now this is hard for most people to understand because we have been used to the idea that if their own family couldn't take care of a child, you gave the kid to somebody else to take care of and he was theirs. We don't operate that way. We say we will give the child what he needs without claiming him. Who should claim him are his biological kin.

"*The Court:* How do these children refer to the therapeutic parents? What do they call them?

"*The Witness:* At the best times, John or Mary or Joe —at the worst times, profanities unmentionable, but they usually call them by their first name or nickname. There are times when a child will feel very, very close to a person and very, very tender and then he might refer to mom or dad, but we don't encourage it because what we are trying to do is not to provide a substitute for the child, we are trying to provide an experience, a human experience, so that he can go back and live with his own and so we contact his family and we work with his family in such a way that the child sees them as the parents."

In addition to the therapeutic parents, other staff members are employed to assist them. An individual is

hired to cook and clean, and another to supervise the children at night. A social worker and a nurse are assigned to the house. The nurse is the only part-time employee. The social worker and nurse may work at one or more houses depending upon the problems and experiences encountered with such houses.

The salaries of the personnel for the Cottage Grove home are paid in part by both Browndale and the Center. A weekly allowance is also given to the Cottage Grove home in the amount of $4 per child per day. This money is used for food, clothing and miscellaneous household expenses such as Kleenex, nongrocery items, etc. The two therapeutic parents receive a minimum of $125 each per week, plus all health and medical group insurance and 40 days of vacation each year. The night supervisor and the individual who cooks and cleans receive $1.60 per hour, and work from thirty-six to forty-eight hours per week. The nurse receives $225 to $250 per month. The social worker receives $10,000 per year. An extra staff is hired to handle any potential crisis at the home or to substitute for a staff member. This "extra staff" receives $135 per week. A medical doctor and psychiatrist are on call and receive $20 to $30 per hour when needed. The general personnel for Browndale and the Center are: (1) A program developer who sets up these homes and receives $10,000 per year; (2) an assistant-director who is available for training and teaching and who receives $12,000 per year; (3) a staff supervisor who receives $130 to $135 per week; and (4) an assistant-director who receives $15,000 per year. Mr. Brown does not receive a salary but he derives his income from the stock investments in Browndale and the Center.

Neither Browndale nor the Center are licensed as foster homes, and only the Center is licensed as a child welfare agency. Mr. Brown testified that prior to January of 1972, the therapeutic family was treated by the

state as a foster home,[4] while the city of Madison treated the three homes located there as boarding houses. Site approval was not needed. The homes were run by licensed foster parents who rented from Browndale. Shortly thereafter the city of Madison changed its definition of "uses" under its ordinance. Site approval was then needed. The state also decided that the Centers should be licensed as child welfare agencies since they provided care and maintenance for more than four children.[5] There were several reasons stated why that licensing category was made. The Involvement Center planned to provide care and maintenance for 105 emotionally disturbed children in 21 homes in Dane county; five home facilities were already in existence by January of 1972. The state determined that sec. 48.60, Stats., compelled the Center to be licensed as a child welfare agency. Browndale agreed to this because then it could receive a federal grant which was not available to licensed foster homes. The Involvement Center, licensed as a child welfare agency, gave the Center its own

[4] Under ch. 48, Stats., there are three categories of licensing classifications, to wit: (1) Foster homes, sec. 48.62; (2) child welfare agencies, sec. 48.60; and (3) day care centers, sec. 48.65. These are all under the authority of the department of health and social services.

[5] Sec. 48.60 (1) and (2) (e), Stats., provides: "**Child welfare agencies licensed.** (1) No person shall receive children with or without transfer of legal custody, to provide care and maintenance for 75 days in any consecutive 12 months' period for 4 or more such children at any one time unless he obtains a license to operate a child welfare agency from the department.

"(2) This section does not include: . . . (e) A licensed foster home."

Sec. 48.62 (1), Stats., provides: "**Foster homes licensed.** (1) No person shall receive, with or without transfer of legal custody, any child to provide care and maintenance for that child unless he obtains a license to operate a foster home from the department or from a county agency or licensed child welfare agency as provided in s. 48.75."

autonomy. The Center would be able to control its own intake and resources for hiring personnel, purchasing facilities and for the care and treatment of the children. In contrast, if licensed as a foster home the Browndale therapeutic homes would remain under the direct and exclusive supervision, control and responsibility of the department. The foster children must then reside with the foster parents in the latters' home. Also, in foster homes the foster parents must be licensed, the parents must live at the home, and such parents must provide specified care in a specified location for a specified period of time under specified conditions. Further, one cannot substitute for a foster parent without the department's expressed permission.

Finally, the record substantiates the fact that Browndale homes have continued to operate the same way before and after its child welfare classification. The therapeutic homes do not operate like or on a large scale institutionalized level such as Mendota State Hospital.

The first issue is whether the circuit court exceeded its jurisdictional scope of review by certiorari.

Both the appellant and the intervenor-appellant contend that sec. 59.99 (10) through (13), Stats., limits the court's review by certiorari. They argue that the circuit court could not go beyond the record, nor can it consider the matter de novo. It is argued that the court's review was limited only to the question of whether the board was within its jurisdiction and not based upon an error of law.

Sec. 59.99 (10) through (13), Stats., provides:

"(10) COURT REVIEW. Any person or persons, jointly or severally, aggrieved by any decision of the board of adjustment, or any taxpayer, or any officer, department, board or bureau of the municipality, may present to a court of record a petition, duly verified, setting forth that such decision is illegal, in whole or in part, specifying the grounds of illegality. Such petition shall be

presented to the court within thirty days after the filing of the decision in the office of the board.

"(11) CERTIORARI. Upon the presentation of such petition the court may allow a writ of certiorari directed to the board of adjustment to review such decision of the board of adjustment, and shall prescribe therein the time within which a return thereto must be made and served upon the relator's attorney, which shall not be less than ten days and may be extended by the court. The allowance of the writ shall not stay proceedings upon the decision appealed from, but the court may, on application, on notice to the board and on due cause shown, grant a restraining order.

"(12) RETURN TO WRIT. The board of adjustment shall not be required to return the original papers acted upon by it, but it shall be sufficient to return certified or sworn copies thereof or of such portions thereof as may be called for by such writ. The return shall concisely set forth such other facts as may be pertinent and material to show the grounds of the decision appealed from and shall be verified.

"(13) COURT DECISION. If, upon the hearing, it shall appear to the court that testimony is necessary for the proper disposition of the matter, it may take evidence or appoint a referee to take such evidence as it may direct and report the same to the court with his findings of fact and conclusions of law, which shall constitute a part of the proceedings upon which the determination of the court shall be made. The court may reverse or affirm, wholly or partly, or may modify the decision brought up for review."

We believe the appellant and the intervenor-appellant misconstrue sec. 59.99, Stats. The statute is explicit on its face. The court, in its discretion, can take additional testimony and other evidence and make findings of fact and conclusions of law. The court then may ". . . reverse or affirm, wholly or partly, or may modify the decision brought up for review." This is exactly what was done in this case under sub. (13). The court did not exceed its scope of review. The statute allows the court to take additional evidence and make additional findings of fact and conclusions of law.

Notwithstanding this statutory pronouncement, the appellants argue that what the statute says is not what it really means. For support they point to this court's decisions in *State ex rel. Morehouse v. Hunt* (1940), 235 Wis. 358, 291 N. W. 745, and *State ex rel. Conn v. Board of Trustees* (1969), 44 Wis. 2d 479, 171 N. W. 2d 418. In *Hunt* the court stated at page 367:

"The case is *certiorari*. When *certiorari* is invoked to review the action of an administrative board, the findings of the board upon the facts before it are conclusive if in any reasonable view the evidence sustains them. *Wisconsin Labor R. Board v. Fred Rueping L. Co.* 228 Wis. 473, 493, 279 N. W. 673. Under this rule the appeal board's view of the facts, so far as they appear from its decision, must be accepted as final and conclusive upon the trial court and upon us. The statutory provision for review by *certiorari* of the board's action, to the effect that the court may take further evidence and may consider it in reaching its determination, may warrant the court's overriding the board's findings of fact if the additional evidence received shows them to be erroneous, but where as here the additional evidence is incompetent it cannot be given that effect however it might be if it were competent. . . ."

In *State ex rel. Conn, supra,* the court stated at page 482:

"(2) Where the statutory remedies are provided, the procedure prescribed by the statute must be strictly pursued. (Citing *Essock v. Cold Spring* (1960), 10 Wis. 2d 98, 102 N. W. 2d 110.)

"(3) In a certiorari case the court is not allowed to consider matters outside the record. (Citing *State ex rel. Kaczkowski v. Fire & Police Comm.* (1967), 33 Wis. 2d 488, 148 N. W. 2d 44, 149 N. W. 2d 547, and other cases.)

"(4) Before a court will grant the writ, it must appear that (a) there has been some error committed; (b) the error has caused substantial harm; and (c) the plaintiff has not been guilty of laches in seeking his remedy. (Citing *State ex rel. Damerow v. Behrens* (1960), 11 Wis. 2d 426, 105 N. W. 2d 866; *Consolidated Apparel Co.*

*v. Common Council* (1961), 14 Wis. 2d 31, 109 N. W. 2d 486.)"

Contrary to appellants' position, both cases are clearly distinguishable and have no application to the scope of review by statutory certiorari. The *Hunt* decision was based on the interpretation of ch. 62 on cities, sec. 62.23 (8) (b) and (i), Stats. 1939. Sec. 62.23 (8) (i) [6] only states that the court shall make a determination. But sec. 59.99 (13) allows the court not only to make a determination but also to ". . . reverse or affirm, wholly or partly, or . . . modify the decision brought up for review." *Hunt* dealt with a review from a decision by the board of appeals established by the city council. In this case the review is from the Board of Adjustment which is a distinct and separate statutory entity. *Hunt* dealt with an interpretation of a different statutory scope of review; the *Hunt* decision itself recognized the court can override the board's findings of fact if additional evidence shows the board's findings to be erroneous.

*State ex rel. Conn, supra,* also is not applicable. In that case, review by certiorari did not allow the court to consider matters outside the record. In this case the court can go outside the record to take additional evidence to make findings of fact and conclusions of law. Sec. 59.99 (13), Stats. *State ex rel. Conn, supra,* was decided on the basis of laches. This is not an issue here.

The appellants argue that this has somehow all been changed by this court's decision in *Buhler v. Racine*

[6] Sec. 62.23 (8) (i), Stats. 1939, provided: "Said court may take evidence or appoint a referee to take such evidence as it may direct and report the same to the court with his findings of fact and conclusions of law, which shall constitute a part of the proceedings upon which the determination of the court shall be made. Costs shall not be allowed against the board, unless it shall appear to the court that it acted with gross negligence or in bad faith."

*County* (1966), 33 Wis. 2d 137, 146 N. W. 2d 403, when review by certiorari is sought from a decision by any zoning authorities. This court in *Buhler* stated, at pages 146, 147:

"We do not hold the trial court was without jurisdiction to hear this case. We have held, and other jurisdictions have generally held, courts have power to grant relief against zoning when it is unconstitutional, unreasonable or discriminatory. Courts can determine whether a zoning ordinance is a valid exercise of the police power, is within the limits of public necessity, and bears a substantial relationship to public purposes of health, safety or welfare. In some cases courts have reviewed zoning classifications to determine whether a classification of uses was fair and reasonable or arbitrary. *Smith v. Brookfield* (1956), 272 Wis. 1, 74 N. W. (2d) 770. In other cases, courts have inquired into the scheme of classification to see if it is applied fairly and impartially in a given case. *State ex rel. Humble Oil & Refining Co. v. Wahner* (1964), 25 Wis. (2d) 1, 130 N. W. (2d) 304; *Geisenfeld v. Shorewood* (1939), 232 Wis. 410, 287 N. W. 683; *Rowland v. Racine* (1937), 223 Wis. 488, 271 N. W. 36; *State ex rel. Tingley v. Gurda* (1932), 209 Wis. 63, 243 N. W. 317; 8A McQuillin, Mun. Corp. (3d ed., 1965 rev.), p. 263, sec. 25.277.

"However, since zoning is a legislative function, judicial review is limited and judicial interference restricted to cases of abuse of discretion, excess of power, or error of law. Consequently, although a court may differ with the wisdom, or lack thereof, or the desirability of the zoning, the court, because of the fundamental nature of its power, cannot substitute its judgment for that of the zoning authority in the absence of statutory authorization. This rule applies not only to the necessity and extent of zoning but also to rezoning, classification, establishment of districts, boundaries, uses, and to the determination of whether or not there has been such a change of conditions as to warrant rezoning. . . ."

Two factors distinguish this case. The *Buhler* decision did not deal with the issue of the "scope of review by statutory certiorari." Statutory certiorari and common-

law certiorari are two different things. *Lakeshore Development Corp. v. Plan. Comm.* (1961), 12 Wis. 2d 560, 107 N. W. 2d 590. A basic issue in *Buhler* was whether a court even has jurisdiction to grant review against zoning ordinances when it is alleged that they are unconstitutional, unreasonable or discriminatory; and then what is the limit of the court's review. Most importantly, *Buhler, supra,* recognized that a court's review, a court's judicial interference, and a court's power to substitute its judgment is limited but only "in the absence of statutory authorization." In this case statutory authorization clearly exists.

This court's decisions in *Lakeshore Development Corp. v. Plan Comm., supra,* and *State ex rel. Casper v. Board of Trustees* (1966), 30 Wis. 2d 170, 140 N. W. 2d 301, not only further negate appellants' position but also help to clarify the apparent confusion between common-law certiorari and statutory certiorari. In *Lakeshore Development Corp.,* this court stated at page 565:

"The writ of certiorari at common law was limited in scope and a motion to quash, either before or after the return to the writ was made, usually raised only questions of jurisdiction or excess power set forth as errors in the petition although other errors might appear in the return. Ferris, Extraordinary Legal Remedies, p. 204, sec. 178. The return was taken as conclusive if responsive to the petition and could not be impeached by collateral affidavits. After the return was made the court could dismiss or quash the writ or enter a judgment of affirmance.

"The scope and purpose of the writ of certiorari has been enlarged by statute and it is now used as a method of appeal to determine not only the jurisdiction of a municipal board or agency but also to review the action of such a board as arbitrary, unreasonable, or discriminatory and sometimes to decide the merits of the action. . . ."

In *State ex rel. Casper, supra,* the court stated at pages 175, 176:

"We point out again . . . that a review by a writ of certiorari has different characteristics than the common-law writ of certiorari. The latter writ is granted in the discretion of the court, *Consolidated Apparel Co. v. Common Council* (1961), 14 Wis. (2d) 31, 109 N. W. (2d) 486, while the statutory review by certiorari is a matter of right and a proceeding which is much enlarged in scope because it inquires into not only the jurisdiction of the board or body making the determination but also the merits of the determination. . . ."

The trial court here did not err by taking additional evidence and basing its findings of fact and conclusions of law, at least in part, upon such evidence.

The trial court concluded as a matter of law that a Browndale home in which not more than five emotionally disturbed children resided, as described in the findings of fact, qualifies as a single family dwelling under the zoning ordinance and requires no site approval. The appellants, the Board of Adjustment and the town of Cottage Grove, contend this is error.

Respondent first maintains that the trial court's decision should be affirmed since the circuit court's findings of fact are not against the great weight and clear preponderance of the evidence. This position would be sound if only a question of fact was presented to this court on review. In *Boutelle v. Chrislaw* (1967), 34 Wis. 2d 665, 673, 150 N. W. 2d 486, this court stated it is ". . . not bound by a finding of the trial court which is based upon undisputed evidence when that finding is essentially a conclusion of law. . . ." The basic issue here is an interpretation of an ordinance. This is a question of law. True, the evidence conflicts as to whether Browndale therapeutic homes prior to January 1, 1972, were ever treated and licensed by the state as foster homes. But this is only a collateral fact in dispute. It is not controlling as to the issue of whether these therapeutic homes are now single family dwellings within the meaning of the ordinance after the Involvement Center

became a licensed child welfare agency. What is also critical is that much of the conflicting trial testimony went to the issue of interpreting and construing the terminology in the ordinance and the department of health and social service's rules governing foster homes and child welfare agencies. This conflict in testimony on how to interpret the law does not change the texture of the issue from law to fact. All the material facts that make up the nature and operation of these therapeutic homes are undisputed. Accordingly, an issue of law, not fact, is presented.

The question then is whether these therapeutic homes are single family dwellings within the meaning of the ordinance. To resolve this issue both the appellants and the respondent rely heavily on this court's decision in *Missionaries of La Salette v. Whitefish Bay* (1954), 267 Wis. 609, 66 N. W. 2d 627. In that case certain basic rules of construction were pronounced, to wit, at pages 614, 616–618:

"Restrictions contained in a zoning ordinance must be strictly construed. A violation of such ordinance occurs only when there is a plain disregard of its limitations imposed by its express words. . . .

". . .

"It is not within the court's province to add or detract from the clear meaning that the village board has expressed in its own definition of the word 'family.' . . .

". . .

"The construction of the ordinance under the facts of record is a question of law. [Case cited.]

". . .

"This court has refused to apply a literal construction of a zoning ordinance in several cases, stating: 'Although the letter of the ordinance is as stated the letter need not necessarily be applied. [Case cited.] "The letter killeth but the spirit giveth life." ' [Case cited.]

"Ordinances, like statutes, are to be construed according to their intent. [Case cited.]"

Although admittedly a close question, we are of the opinion that Browndale therapeutic homes are not single

family dwellings. These therapeutic homes are not "occupied exclusively as a residence for one family" under sec. 10.01 (18) (a) of the ordinance. First, Browndale's purpose is commercial. This foreign corporation is in the sole business of buying property with homes located on it for the purpose of leasing such homes for profit to Involvement Centers as care facilities.[7] Respondent argues that such a factor is immaterial, but this argument only attempts to avoid the issue. The commercial aspect is very relevant to the actual use of the homes, especially when Browndale intends to lease six homes on a 182-acre plat site. Six therapeutic care facilities located in one concentrated area are more in truth a colony of homes for the care and treatment of emotionally disturbed children. In fact, such a concentrated group of therapeutic homes would be much the same as one large institutional complex of buildings on property which cared for 30 children. Such a concentration of homes could very well defeat Mr. Brown's philosophy of integrating small groups of children into the community area in order to duplicate family life-style. The use of the premises is not even principally for residential living purposes. Rather, its primary use is to provide care and treatment for emotionally disturbed children. A staff is hired expressly for this purpose. The children in these therapeutic homes just do not merely live upon the premises, they are there primarily for rehabilitation and treatment. Duplicating the family life-style is only one of the elements of rehabilitation. Other elements such as psychiatric and medical care and strict supervision are also essential ingredients. The therapeutic home "arrangement" is substantially different than a group of priests, nurses, school teachers, students or others who acquire premises to use as a residence for a group. The Board of Adjustment's decision had a substantial basis

---

[7] It must be remembered that Browndale admitted this in its petition for review, and it also stated that it was not engaged in the business of caring for emotionally disturbed children.

in fact when it found that the intended meaning of a "single family dwelling" does not include care and treatment homes for emotionally disturbed children. This is especially true when one looks at the fact that six therapeutic homes are planned to be colonized in one site area.

We believe that the use and occupancy of the premises by therapeutic care centers as a single family dwelling not only defeat the zoning ordinance's intent but they also disregard the limitations imposed by the express words of the ordinance—"occupied exclusively as a residence for one family." [8]

If it were not for the extensive staff which manages, directs and controls these children, the homes would cease to exist.

The question then is what classification of "uses" do these homes fall under, and where can the homes be located? As the record points out, the Board of Adjustment classified these therapeutic homes as the "type of use" covered under sec. 10.12 (2) (c) of the ordinance. Sec. 10.12 (2) (c) allows permitted uses subject to site approval for "extended care facilities," [9] but respondent argues that such homes are not extended care facilities and to interpret therapeutic homes as such thwarts their purpose. Even if these are not extended care facilities, the Board of Adjustment has the statutory power under sec. 59.99 (7) (b), Stats., to grant ". . . special exceptions to the terms of the ordinance upon which such board is required to pass under such ordinance." The board also has the power and authority under sec. 59.99 (7) (c) to grant in ". . . specific cases such variance from the terms of the ordinance as will not be contrary to the public interest, . . ." The fact that the board has already allowed one therapeutic home

---

[8] Sec. 10.01 (18) (a) of the ordinance.

[9] Miss Nina Neupert, a social worker for the department of health & social services, testified the care was "intensive" and "extensive."

in this disputed district in the town of Cottage Grove evidences this. It cannot be reasonably said that the board is attempting to thwart this method of care and treatment for emotionally disturbed children. The board has expressed no objection to the therapeutic home idea but only justifiably refused to interpret the therapeutic home as a single family dwelling—especially in light of Browndale's commercial attempt to colonize six homes in one site area under the guise of designating them as single family dwellings. It is apparent that Browndale does not want to be forced to obtain site approval for the six therapeutic homes planned to be colonized on the 182-acre area. The minutes of the board meeting indicate that this was one of the major disputes.[10]

The respondent argues that a therapeutic home is no different than a foster home. In particular, it is maintained that: (1) Therapeutic homes can qualify as foster homes; (2) that there is no substantive difference between the two homes; (3) that the homes provide the same type of services; and (4) both homes are really one and the same. Therefore, it is maintained that therapeutic homes are being denied their fourteenth amendment right to equal protection under the law since foster homes are a permitted use as a single family dwelling unit.

The constitutionality of the state's general power to zone property is founded in the public interest. The state's police power may be delegated by it to the cities and counties. Like other regulations under the police power, ". . . a specific zoning ordinance must meet the constitutional demands of due process and the equal protection of the law. . . ." *State ex rel. Wisconsin Lutheran High School Conference v. Sinar* (1954), 267

---

[10] In the minutes of the board meeting it was also brought out that Mr. Brown not only intended to have six homes on the 182-acre site but also had originally planned to build 20 more units. Supposedly this plan to build 20 more home units was abandoned.

Wis. 91, 95, 65 N. W. 2d 43, case dismissed, 349 U. S. 913, 75 Sup. Ct. 604, 99 L. Ed. 1248. In *Sinar* the court also stated, at pages 95, 96:

". . . It must '. . . provide those in similar circumstances, among whom no reasonable basis for distinction exists, with equal protection of the law, as is constitutionally required of all ordinances as well as statutes.' . . .
"' . . .
"' . . . a classification to be valid must always rest on a difference which bears a fair, substantial, natural, reasonable, and just relation to the object, act, or persons in respect to which it is proposed.' . . ."

In *Scharping v. Johnson* (1966), 32 Wis. 2d 383, 396, 145 N. W. 2d 691, the court stated:

"' . . . classifications of persons or property must be based upon reasonable differences or distinctions which distinguish the members of one class from those of another in respects germane to some general and public purpose or object of the particular legislation.' *Christoph v. Chilton* (1931), 205 Wis. 418, 237 N. W. 134.
"In *Madison Metropolitan Sewerage Dist. v. Committee* (1951), 260 Wis. 229, 253, 50 N. W. (2d) 424, we stated that:
"'The question of classification is primarily for the legislature, both as to need and basis. . . . All that seems to be required is that there must be some reasonable basis along general lines for the adoption, all reasonable doubts to be resolved in favor thereof . . . .'"

The respondent has made a forceful argument that therapeutic homes appear to be no different than foster homes. These two types of homes have substantial differences that permit separate reasonable classifications. Therapeutic homes are not being denied equal protection of the law under the zoning ordinance. There are relevant distinctions between foster homes and therapeutic homes. Mr. Brown testified that therapeutic parents and therapeutic homes are not substitutes for the biological parent or home. Foster parents and foster homes

are an attempt to be almost a complete substitution. The foster parents' role is *"in loco parentis."* Children in foster homes are not necessarily delinquent, dependent nor neglected. The foster home's main emphasis is not rehabilitation. In contrast, therapeutic homes described herein accept types of severely emotionally disturbed children for the purpose of rehabilitation. Foster homes are not financial enterprises; the attempt is only to render a service. This cannot be said about Browndale or its affiliated Involvement Center in their ownership and management of therapeutic homes. Therapeutic homes are under the control of the department of industry, labor & human relations' building code. The home facilities must meet fire regulations, plumbing regulations, etc., and such homes are inspected and treated differently than the regular residence or foster home. Foster homes try to duplicate the biological family. Therapeutic homes only try to duplicate the family lifestyle. For instance, the foster child lives and sleeps with the foster parent at the foster home. This is not true for the therapeutic home. The therapeutic parent does not live or sleep there but rather works at such home. If married, both spouses are required to apply for a foster parent license. The foster parent and not the home is licensed. In the therapeutic home the house must be licensed, but the therapeutic parent need not be. The foster parent and foster home remain under the direct control, supervision and responsibility of the H&SS Department. The foster parent must enter into a contractual agreement with the department. Not so for the therapeutic home because as a child welfare agency it is autonomous. The therapeutic home is not under the same type of control at all, nor is the therapeutic parent under a contract with the department. Mr. Brown testified that the therapeutic home concept is not explicitly aimed at avoiding the notion of institutions. The foster home is in no way related to institutionalization.

Foster homes cannot have more than four children without the express permission of the department. Therapeutic homes have no numerical limitation as to the number of children it can care for and treat in one home. Secs. 48.60; 48.62; and 48.64 (3), Stats. PW-CY 40.62 (2) (g) (7 Wis. Adm. Code), talks specifically about foster children sleeping in a "single family dwelling" with the foster parent. Sub. (2) (e) states a foster child cannot sleep in any building, apartment, or other structure which is separate from the family home. There is no such specific limitation for therapeutic homes. Lastly, from the above differences it can be reasonably said that foster homes constitute a "family" under zoning laws even before any child is placed with the foster parent. As appellants correctly point out, ". . . The residential character of a foster home does NOT depend upon the foster child. . . ." This cannot be said for Browndale therapeutic home facilities.

These enumerated distinctions show beyond reasonable doubt that foster homes have a fair, substantial, natural, reasonable and justifiable classification not in violation of constitutional equal protection. The Board of Adjustment could reasonably conclude, under a rational construction of the zoning ordinance, that the Browndale-type therapeutic homes did not come within the ordinance definition of a family and that several of them within a limited area were inconsistent with the intention and purpose of the zoning ordinance. The board in determining that Browndale homes would not be permitted in the A-1 residential zone without prior site approval acted reasonably and within its jurisdiction.

The respondent contends that since both the appellant and the intervenor-appellant failed to include an adequate abridgement of the trial testimony in their appendices as required by sec. (Rule) 251.34 (5) (c), Stats., the court should impose double costs, assume that the evidence supports the trial court's findings and affirm the case

without opinion. Intervenor-appellant argues that there was adequate compliance with sec. (Rule) 251.34 (5) (a), (b), (c) and (d), when its appendix and appellant's are read together.

The defendant-appellant, the Board of Adjustment for the county of Dane, only sets forth the memorandum decision, the findings of fact, conclusions of law and judgment in its appendix. The intervenor-appellant, town of Cottage Grove, in its appendix, provided four pages of abridged testimony from a transcript of testimony in excess of two hundred pages. The respondent did prepare and submit a substantial and helpful abridgement of the testimony.

It is clear that appendices of the appellants do not comply with sec. (Rule) 251.34 (5) (c), Stats., which require an abridgement of the trial testimony.

The court, although it was inconvenienced by a lack of a proper appendix, was able to determine the facts from the transcript, the respondent's appendix, and the excellent and comprehensive memorandum opinion filed by the trial court. Because of the public importance of these matters the case could not be affirmed without opinion, but because of the failure of the appellants to adequately comply with sec. (Rule) 251.34 (5) (c), Stats., the court will not allow costs on this appeal. Sec. (Rule) 251.38 (2).

*By the Court.*—The judgment of the circuit court is reversed and cause remanded with directions to affirm the decision of the Board of Adjustment for Dane county.