CROWLEY, and others, Plaintiffs-Respondents, v. KNAPP, and others, Defendants-Appellants.

Supreme Court

*No. 76–398. Argued September 10, 1979.—Decided March 4, 1980.*
(Also reported in 288 N.W.2d 815.)

422

HEFFERNAN, J. This case arises out of the attempted enforcement of restrictive covenants in a deed to two lots in an area known as "Meadowlane" in the outskirts of Prairie du Chien, Wisconsin. The property was purchased in 1973 by Donald F. Knapp and his wife, Bette M. Knapp (hereafter the Knapps), for the purpose of establishing a non-institutional home for retarded adults. Neighbors, who took title to their property from a common grantor, brought an action to enjoin the defendants from using the property for this purpose on the grounds that it violated the restrictive covenants. The court, after a trial, enjoined the defendants from the use of the property as a residence for retarded adults upon finding that the Knapps had violated the following deed covenants:

"1) The use of said premises shall be restricted to the construction of one single family dwelling, with a one or two car garage, and shall be used for residential purposes only.

"2) No garage or outbuilding or part of the same shall be used as a residence at any time, either before or after construction of the residence."

Although no specific finding was made in respect to the covenant violated, the court also enjoined the defendants from carrying on any commercial activity on the premises. The appeal by the Knapps is from the entire judgment.

The basic question is whether, based on the undisputed facts, the defendants' use of the property as a state-licensed, run-for-profit group residence housing eight unrelated retarded adults violated the covenant requirement that the property's use "shall be restricted to . . . one single family dwelling . . . for residential purposes only." Before that question can be addressed, however, it must be determined whether the plaintiffs, neighboring landowners, who derive their titles from a common grantor, can enforce restrictive covenants incorporated in a deed to which they are not parties.

The record demonstrates that the original landowners of the parcel known as Meadowlane were Clarence and Mildred Ahrens (hereafter Ahrens). On March 28, 1968, Ahrens conveyed a lot to Gerald E. and Linda L. Wright (hereafter the Wrights), who are plaintiffs in this action. On May 10, 1968, Ahrens conveyed a lot to the other plaintiffs, John F. and Eileen M. Crowley (hereafter the Crowleys). On the same day, Ahrens conveyed two lots to Franklin A. and Mary A. Weeks (hereafter the Weeks). It is the use of this property, conveyed to the Knapps on November 2, 1973, which is in question in this action. At the time of the initial conveyance to the Wrights, each lot of the Ahrens' property was marked by stakes. Each of the Meadowlane lots subsequently conveyed by Ahrens was subject to restrictive covenants which were substantially identical to those applicable to the Knapps' property.

The plaintiffs in this case were not privy to the restrictive covenants in the deed from Ahrens to the Weeks or the deed from the Weeks to the Knapps. The

Knapps take the position that, although an owner of land may impose restrictions upon the portion conveyed, those restrictions create only a personal right in the grantor unless it is apparent from the face of the instrument or it is clear by fair implication that the right will inure to the benefit of other grantees acquiring title in the same tract. Stated differently, the fact that the owner of one lot would be benefited by the enforcement of a restrictive covenant in a deed conveying a nearby lot to another party does not entitle the former to enforce the covenant where there is no privity of contract, unless it is shown that the parties derived title from a common grantor, that the restrictions were imposed for the benefit of the other lot, and that the party seeking to enforce the covenant purchased his lot with the knowledge of, or in consideration of, the restrictions.

State courts have adopted different theories to justify the enforcement of restrictive covenants by one who is not privy to the instrument containing the covenant sought to be enforced. *See generally,* Annot., *Who May Enforce Restrictive Covenant,* 51 A.L.R.3d 556 *et seq.* (1973) ; 20 Am. Jur. 2d, *Covenants,* sec. 292 *et seq.*

In Wisconsin, this court has enforced private deed covenants on the theory that the common grantor imposed restrictions on each parcel of property sold, with a general scheme in mind of making the individual lots more attractive to all purchasers. According to this theory, even in the absence of privity of contract, another purchaser of land in the same tract may enforce the covenant when there is evidence to show that the original grantor inserted the covenant to carry out a general plan or scheme of development. The question, then, is whether the common grantor, Ahrens, placed the restrictive covenants in the deed for the purpose of carrying out a general plan of development, which was to inure to the benefit of other grantees.

This court has repeatedly accepted the "general plan or scheme doctrine" in determining whether a person purchasing property in a particular tract may invoke the equitable powers of the court to enforce a covenant to which he was not privy. Representative cases approving relief on this theory are *Ward v. Prospect Manor Corp.*, 188 Wis. 534, 206 N.W. 856 (1926); *Boyden v. Roberts*, 131 Wis. 659, 111 N.W. 701 (1907). The court most recently stated the doctrine in *Hall v. Church of the Open Bible*, 4 Wis.2d 246, 248, 89 N.W.2d 798 (1958). The court said:

"It is a well-established rule that a covenant restricting land to residential use, inserted by the proprietor in a conveyance of his lands, inures to the benefit of all the purchasers where it is inserted for the purpose of carrying out a general plan or scheme of development, and that it constitutes at least an equitable servitude upon the land, and constitutes a valuable property right which a court of equity will enforce in the absence of facts and circumstances making such enforcement unjust or inequitable."

The trial court specifically held that the Crowleys and the Wrights, the common grantees, were proper parties to enforce the restrictions, because it found:

"That it was the intent and purpose of Ahrens to create and adopt a general plan or scheme for a subdivision to be known as Meadowlane Addition which would contain only single family dwellings used exclusively for residential purposes . . . ."

A trial court's finding of fact in respect to a grantor's intention to create a restrictive covenant running with the land is entitled to the same weight on appeal as are other findings of fact by a court. *Clark v. Guy Drews Post*, 247 Wis. 48, 18 N.W.2d 322 (1945). Accordingly,

the court's finding must be accepted unless contrary to the great weight and clear preponderance of the evidence.

Our examination of the record shows that Ahrens consistently inserted substantially identical covenants into the Meadowlane deeds. When he made his original conveyances, Ahrens stated that he intended to put the same restrictions on all the Meadowlane property, and he instructed his real estate representative to put the same deed restrictions on any remaining Meadowlane property when it was sold. Additionally, when Ahrens sold the first parcel, the entire Meadowlane tract had been staked out, showing that a common plan for the disposition of all the Meadowlane property existed from at least 1968.

The defendants assert, however, that a general plan of development can be proved only if there was evidence that the plan existed when the initial conveyances were made to the Weeks and the Crowleys on May 10, 1968. The defendants argue that there was no legally cognizable subdivision on that date and that it is only from the pattern of the subsequent conveyances that any evidence can be gleaned of a common plan. The Knapps argue that no general plan existed at the time of the original conveyance of the property eventually acquired by the Knapps, and that, therefore, the covenants in the chain of title by which the Knapps acquired the property were enforceable only by the privies to those deeds.

The record shows that the trial court considered not only the conduct and representations of the common grantor at and prior to the original conveyance, but also considered his subsequent conduct in selling other Meadowlane parcels.

Boyden v. Roberts, supra, and Ward v. Prospect Manor Corp., supra, conclude that the general plan or scheme for the subdivision could be ascertained from the common grantor's manifestation of intent prior to conveying any

part of a defined area. Although such prior manifestations of intent are sufficient to show a general plan, a Wisconsin court is not restricted to the examination of conduct occurring at or prior to the original conveyance. In *Schneider v. Eckhoff*, 188 Wis. 550, 206 N.W. 838 (1926), the court stated that the grantor's intent to create a general development plan could best be determined by examining the pattern manifested by all of his conveyances. In *Schneider*, the court considered whether a grantee could build a combination residence-retail building in a platted subdivision containing individual deed restrictions. The court stated:

"The serious question involved on this branch of the case consists of whether or not the evidence warrants the conclusion that the original grantors adopted a general plan or scheme which was designed not only for the benefit of the grantors' remaining property but also for the benefit of the various grantees of the lots or parcels sold and their successors or assigns. . . . In the instant case, if it be held that a general scheme or plan was adopted, it must follow from the execution of the various deeds containing the restrictions to the respective purchasers. . . . Whether or not these restrictions were intended for the benefit of the grantees is largely a matter of intention, and this intention can be gathered not only from the nature and form of the deeds themselves but from all the surrounding facts and circumstances." (pp. 556–57)

Perhaps most significantly, the court in *Schneider* said, "Even the last deed contained these restrictions, which fact is of evidentiary value . . . ." (p. 558) Thus, in *Schneider*, the court examined not only the conveyances to the parties involved, but also examined subsequent conveyances and the subsequent conduct by the common grantor as evidence of his intent to adopt a general plan for the benefit of other grantees of the lots.

The trial judge in the instant case applied the rationale stated in *Tubbs v. Green*, 30 Del. Ch. 151, 161, 55 A.2d 445 (1947). Therein the court said:

"Implicit in the very creation of a residential plan by the practice of inserting residential restrictions in deeds is the fact that the plan evolves and does not immediately burst into full bloom. Therefore, I cannot agree that restrictions imposed subsequent to the date of those imposed on defendant's property may not be considered in determining whether a residential plan was created."

We accept the statement in *Tubbs* and explicitly approve it as an expression of Wisconsin law. We conclude that the trial judge appropriately applied Wisconsin law when he examined all the common grantor's conveyances and all manifestations of intent in determining that there was a general plan or scheme. The restrictive covenants which were a part of that plan could be equitably enforced by all of the grantees whose titles derived from the common grantor. The facts found by the judge to show a common plan of development are not contrary to the great weight and clear preponderance of the evidence. The trial judge correctly determined that the Crowleys and the Wrights, although not privy to the particular instrument conveying the land in question, had the right to enforce the covenants contained therein.

The principal question to be resolved on this appeal, however, is whether the defendants' use of the property violates the restrictive covenants. The trial court found, as a fact, that they were in violation of restrictive covenants 1 and 2 of the deed. A finding of fact, if it indeed be one, cannot be reversed unless it is contrary to the great weight and clear preponderance of the evidence. However, that rule is inapplicable if what is labeled as a finding of fact is essentially a conclusion of law. *Boutelle v. Chrislaw,* 34 Wis.2d 665, 673, 150 N.W.2d 486 (1967). The construction of the terms of an ordinance restricting the use of property is a question of law when there is no dispute in the evidence in respect to the use of the prop-

erty. *Browndale International, Ltd., v. Board of Adjustment,* 60 Wis.2d 182, 199–200, 208 N.W.2d 121 (1973). The same rule applies to findings of fact pertaining to private deed restrictions. *See, State ex rel. Bollenbeck v. Shorewood Hills,* 237 Wis. 501, 508, 297 N.W. 568 (1941). Because there is no dispute about the defendants' use of the Meadowlane property, the questions posed are matters of law, and the trial court's interpretation of the deed restrictions is entitled to no special weight on appeal.

A review of the facts concerning the use of the property is, however, appropriate. The record shows that in 1972 the defendants, Donald F. Knapp and Bette M. Knapp, organized a business corporation known as Lori Knapp, Inc. This corporation was organized to operate a non-institutional family care home for retarded children. This home operated successfully. At the suggestion of a representative of the Wisconsin Department of Health and Social Services, the Knapps undertook the establishment of a similar type of residential home for retarded adults. In July of 1973, the Knapps negotiated for the purchase of two adjacent lots from the Weeks. Located on the property was a large residence which could be made suitable for this purpose. The Weeks, as recited above, secured their title from Ahrens, the common grantor, on May 10, 1968. In the course of negotiations, the Weeks told the defendants that the property deed contained restrictive covenants which might be construed to prevent the use of the property for a group home. These restrictions in part provided:

"The real estate described in the annexed deed is sold and conveyed subject to the following restrictive covenants, which shall be in full force and effect hereafter and shall be in the nature of covenants running with the land and which, by the acceptance of this conveyance, shall bind the grantee or grantees and his, her or their successors in title, to-wit:

"1) The use of said premises shall be restricted to the construction of one single family dwelling, with a one or two car garage, and shall be used for residential purposes only.

"2) No garage or outbuilding or part of the same shall be used as a residence at any time, either before or after construction of the residence.

". . .

"7) No residence shall be constructed or remodeled which will house more than one family nor shall any residence be higher than two stories.

". . .

"13) No noxious or offensive trade or activity shall be carried on or conducted on the premises, nor shall anything be done therein or thereon which may become an annoyance or nuisance to the neighbors.

"14) Invalidation of any one of these covenants by any Court shall in no wise affect any of the other provisions which shall remain in full force and effect . . . ."

Prior to proceeding with the transaction, the Knapps told the Crowleys and the Wrights of their plan to purchase the property and explained its intended use. Before the closing of the sale between the Weeks and the Knapps, the Crowleys and the Wrights served a written notice stating that they objected to the intended use of the property because it violated the restrictive covenants. Although the Weeks offered to release the defendants from the sales contract, the Knapps purchased the property. The deed contained the restrictive covenants set forth above.

The Knapps then leased the property to the Lori Knapp Corporation. Before using the property, a number of improvements and alterations were made to the premises, the most notable of which was the conversion of the attached garage into two bedrooms. Through the cooperation of the Wisconsin Department of Health and Social Services, the defendant, Lori Knapp, Inc., secured eight mentally retarded adult occupants as volunteer residents of the home. The building was used as a resi-

dence, and the persons living on the premises shared the common areas of the house—the living room, dining room, and recreation rooms—and they ate their meals together. They left the house during the day to attend a county-operated development center and some of them apparently had jobs for which they were paid. They were "high functioning persons," in that they were able to take care of their personal needs and assisted with the cooking and the housekeeping. A nonprofessional couple resided at the house on a full-time basis to feed the occupants and to serve in a parental role for the eight residents. The eight residents lived there voluntarily on a permanent basis. No professional care or therapy was available in the house. The purpose of the home was to provide a residential living environment for retarded citizens to enable them to become a part of the community. [1]

---

[1] *See*, sec. 46.03(22)(d), Stats. 1977, which provides:

"(22) COMMUNITY LIVING ARRANGEMENTS.

"(d) A community living arrangement with a capacity for 8 or fewer persons shall be a permissible use for purposes of any deed covenant which limits use of property to single-family or 2-family residences. . . . Covenants in deeds which expressly prohibit use of property for community living arrangements are void as against public policy."

This subsection was enacted as part of ch. 205, Laws of 1977 (A.B. 383), effective March 28, 1978. The statement of legislative purpose accompanying this subsection provides:

"SECTION 1. **Legislative purpose.** The legislature finds that the language of statutes relating to zoning codes should be updated to take into consideration the present emphasis on preventing or reducing institutionalization and legislative and judicial mandates to provide treatment in the least restrictive setting appropriate to the needs of the individual. This change in emphasis has occurred as the result of recent advances in corrections, mental health and social service programs. It is the legislature's intent to promote public health, safety and welfare by enabling persons who otherwise would be institutionalized to live in normal residential settings, thus hastening their return to their own home

Although the evidence indicates that, before the establishment of the home, the plaintiffs were concerned that the activities at the home would create a common-law nuisance or be an annoyance, the evidence is uncontradicted that these retarded adults created no problems or annoyance in the neighborhood.

Two crucial conclusions of the trial court must be examined in light of the uncontroverted facts. It is apparent that the trial court's finding that the defendants were in violation of covenant 2, which prohibits living in a garage or outbuilding, is erroneous as a matter of

by providing them with the supervision they need without the expense and structured environment of institutional living. To maximize its rehabilitative potential, a community living arrangement should be located in a residential area which does not include numerous other such facilities. The residents of the facilities should be able to live in a manner similar to the other residents of the area. The legislature finds that zoning ordinances should not be used to bar all community living arrangements since these arrangements resemble families in all senses of the word except for the fact that the residents might not be related. The legislature also finds that deed covenants which restrict or prohibit the use of property for community living arrangements are contrary to the vital governmental purpose of achieving these goals. The legislature believes these matters of statewide concern can be achieved only by establishing criteria which restrict the density of community living arrangements while limiting the types of and number of facilities which can exist in residential neighborhoods having an appropriate atmosphere for the residents, thereby preserving the established character of a neighborhood and community."

The parties to the instant litigation did not argue the applicability of this statute to the case before us. Because we resolve the present case without need to resort to the 1977 statute, we do not consider whether it voids prior restrictive covenants.

We do note, however, that the express legislative intent underlying the above provision, in harmony with the elementary principle of property law favoring the free and unrestricted use of land, is to enable "persons who otherwise would be institutionalized to live in normal residential settings."

fact. The portion of the building which had been used as a garage prior to the purchase by the Knapps was not an outbuilding, but was attached to the main portion of the house. Although a garage prior to the alterations, the defendants, immediately upon purchase, converted the area into two bedrooms. The remodeling included raising the floor to conform to that of the contiguous house and adding interior lights, insulation, windows, carpeting, and drapes. The floor plan of the remodeled building shows that no part of the structure could be used for garage purposes. Covenant 2 does not prohibit the conversion of a garage into bedrooms. It was contrary to the evidence for the trial court to conclude that a garage was being used as a residence. After the remodeling, the area was an integral part of the residence and bore no resemblance to a garage.

The court also concluded that the grantor, by the covenant, intended to restrict the properties' use to single family residences "occupied by a group of people who were related to one another by blood or marriage and who resided in such dwelling as a single housekeeping unit."

In reaching that conclusion, the trial judge construed the term "family" in the restrictive covenant to mean only those persons who are related by consanguinity or marriage. An inspection of the covenants themselves makes it obvious that the drafter of the covenant did not define "family" in that manner. "Family" is used without definition.

This court consistently holds that public policy favors the free and unrestricted use of property. Accordingly, restrictions contained in deeds and in zoning ordinances must be strictly construed to favor unencumbered and free use of property. *McKinnon v. Benedict,* 38 Wis.2d 607, 619, 157 N.W.2d 665 (1968) ; *State ex rel. Bollenbeck v. Village of Shorewood Hills,* 237 Wis. 501, 297 N.W.

568 (1941); *Cohen v. Dane County Board of Adjustment,*
74 Wis.2d 87, 91, 246 N.W.2d 112 (1976). In *Cohen,* we
cited Rathkopf, 1 *The Law of Zoning and Planning* (4th
ed.), ch. 9, at p. 9.1, for the proposition that restrictions
on the use of property are to be construed in favor of
free use. A provision either in a zoning ordinance or in
a deed restriction which purports to operate in derogation
of the free use of property must be expressed in clear,
unambigous, and peremptory terms.

This rationale was employed in *Missionaries of La
Salette v. Whitefish Bay,* 267 Wis. 609, 66 N.W.2d 627
(1954). In that case, the Village of Whitefish Bay, by
zoning ordinance, purported to restrict the use of prop-
erty in the particular district to single-family dwellings.
The ordinance defined "family" as "one or more in-
dividuals living, sleeping, cooking, or eating on premises
as a single housekeeping unit." (p. 611) In *La Salette,*
the building in a residential neighborhood was occupied
by a group of priests and lay brothers, who at no time
exceeded eight in number. The two lay brothers did the
housekeeping and prepared and served the meals. The
priests lived at the home but performed their religious
duties elsewhere. The Village of Whitefish Bay argued
that the term "family" was restricted in meaning to a
group of individuals related to one another by blood or
marriage. This court disagreed, relying upon the public
policy that restrictions placed upon the use of land must
be strictly construed. We stated that a violation of a zon-
ing ordinance can only occur when there is a plain disre-
gard of limitations imposed by express words. The court,
relying upon *Bollenbeck, supra,* said:

" 'Covenants restricting the use of land are construed
most strictly against one claiming their benefit and in fa-
vor of free and unrestricted use of property; a violation
of the covenant occurs only when there is a plain dis-
regard of the limitations imposed by its express words.' "
(p. 614)

The court pointed out that this rule is equally applicable to private deed restrictions and building and zoning ordinances. The court held that the Missionaries of Our Lady of La Salette were not in violation of the zoning restriction, because the ordinance did not expressly define a "family" to exclude all who are not related by blood or marriage relationship. The court stated:

"Had it been the pleasure of the legislative body when defining the word 'family,' to have excluded in the district any dwelling use of premises there situated, by a group of individuals not related to one another by blood or marriage, it might have done so. Since there is a complete absence of any such limitation, it seems clear that it was not the legislative intent to restrict the use and occupancy to members of a single family related within degrees of consanguinity or affinity." (p. 615)

The court went on to discuss the ordinary meaning of the word, "family":

"It is to be noted that aside from the definition of the term 'family' in the ordinance, the ordinary concept of that term does not necessarily imply only a group bound by ties of relationship.

" 'Family' is derived from the Latin *familia*.' Originally the word meant servant or slave, but now its accepted definition is a collective body of persons living together in one house, under the same management and head subsisting in common, and directing their attention to a common object, the promotion of their mutual interests and social happiness."

In *La Salette*, this court said that the term, "family," did not necessarily exclude from its meaning a group of unrelated persons living together in a home. The court held that the eight priests who lived, slept, cooked, and ate upon the premises as a single housekeeping unit were not in violation of the zoning ordinance. It concluded that the term, "family," would not be construed to import the requirement of consanguinity or affinity between the

parties when those requirements were not expressly set forth. By dicta, the court expanded its holding by stating:

"The arrangement appears to be no different than were a group of school teachers, nurses, etc., in some collective capacity, to acquire the premises, use the same as a residence for the group, and pursue their avocations away from the place." (pp. 616–17).[2]

The factual similarity between the nature of the occupancy of the priests and the persons in the Knapp home is striking, and the term, "family," used in imposing the purported restriction is identical. *La Salette* held that in legal usage, unless otherwise defined, a family may mean a group of people who live, sleep, cook, and eat upon the premises as a single housekeeping unit. Moreover, as was also pointed out in *La Salette,* the commonly held understanding of the term, "family," like its legal usage, "does not necessarily imply only a group bound by ties of relationship." *Id.* at 615. If the meaning of that term is to be further limited, the limitation must be expressly stated. As in *La Salette,* the restrictive covenant in the present case did not define "family" to be a group related by consanguinity or marriage.

---

[2] Because in the case now before the court we conclude that the occupants of the Lori Knapp Meadowlane Home did not violate the express restrictions of the deed, we do not address ourselves to the equal protection question of whether a definition of "family" limited to consanguinity or marriage would withstand attack as an unconstitutional classification. *See, Timberlake v. Kenkel,* 369 F. Supp. 456 (1974), in which it was held that the definition of the term, "family," in a village zoning ordinance requiring a blood or marriage relationship was unconstitutional as being in violation of the equal protection clause of the United States Constitution. While *Timberlake* held that the Village of Shorewood's ordinance constituted state action in violation of equal protection, we note that judicial enforcement in a state court of a similarly offensive private deed restriction would also constitute state action. *Barrows v. Jackson,* 346 U.S. 249 (1953); *Shelley v. Kraemer,* 334 U.S. 1 (1948); *cf., Moore v. East Cleveland,* 431 U.S. 494 (1977).

It is contrary to the public policy of this state to impose a restriction upon the use of land when that restriction is not imposed by express terms.[3] We accordingly conclude that the occupancy of the home by the adult retarded residents did not violate the restrictive deed covenants.

This conclusion is further supported by this court's discussion in *Browndale International, Ltd. v. Board of Adjustment*, 60 Wis.2d 182, 208 N.W.2d 121 (1973). In *Browndale*, this court found that the use violated the Dane County zoning ordinances, because:

"The use of the premises is not even principally for residential living purposes. Rather, its primary use is to provide care and treatment for emotionally disturbed children."

The children in *Browndale* were there for psychiatric and medical care. The court harkened back to the language of *La Salette*, stating:

---

[3] Without reference to any authority whatsoever, the dissents ignore the fundamental concept that private deed restrictions, like zoning and building ordinances, must be strictly construed in favor of the free and unrestricted use of property. The authors of the dissenting opinions interpret the covenant largely on the basis of the grantor's probable intent. That position is erroneous as a matter of law, because only the intent of the grantor as expressly set forth in the covenant is relevant. *Schneider v. Eckhoff*, 188 Wis. 550, 556, 206 N.W. 838 (1926), explicitly holds that one does not look to an amorphous general intent in determining the meaning of the restrictive words, but, instead, must look to the very words used:

"[I]f it had been the intention of the original owners to exclude all business, such intention could easily and readily have been expressed. At most, it may be said that the language used in the restriction is doubtful in its meaning, and in such a case all doubt, under the general rule, should be resolved in favor of the free use thereof for all lawful purposes by the owner of the fee. See numerous cases cited and digested in the annotations in 18 A.L.R. 451." (at 555–56)

"The therapeutic home 'arrangement' is substantially different than a group of priests, nurses, school teachers, students or others who acquire premises to use as a residence for a group." (p. 201)

*Browndale* is different from *La Salette* and different from the instant case, because, in the instant case, as in *La Salette,* the structure is used only as a residence and not for therapy. *Browndale* was a treatment center. Additional distinctions exist between *Browndale* and this case. In *Browndale,* the defendant intended to use the property for a cluster of six homes. The court pointed out that what was proposed as an "institutional complex." (p. 201) *Browndale,* then, posed an entirely different problem than that presented in this case or in *La Salette*. Aside from whether the persons in *Browndale* constituted a family, it was apparent that they were not occupying the property as a residence when they were placed there involuntarily by court order for temporary psychiatric and medical care. Moreover, it should be emphasized that, unlike the transient nature of the childrens' occupancy of the treatment centers in *Browndale,* the Lori Knapp residents regard the home as their permanent residence. This is not a boarding house; the same eight people have resided at the home since it opened, and the record clearly indicates that they planned to remain there permanently.

An additional distinction between *Browndale* and this case is important. In *Browndale,* this court found a violation of the *zoning* ordinance, because Browndale's sole purpose was commercial. Under the Dane County zoning regulations, no commercial establishment was permitted in a one-family-use district.

In the instant case, we are confronted not with a zoning ordinance, but with a restrictive covenant in a private deed. The covenants in the deeds here do not foreclose the use of the property for commercial purposes. In fact, they specifically provide that "[n]o noxious or

offensive trade" shall be carried on. It is noteworthy that there is no prohibition whatsoever of commercial use. A reasonable inference to be derived from the covenant is that commercial use is permissible if not "noxious or offensive." The use of the premises annoyed no one, and no attempt was made to show any noxious or offensive trade.

The rationale of *Browndale* is not applicable. This court, in *Browndale,* properly excluded commercial activity, because, under the scheme of zoning ordinances adopted pursuant to Wisconsin law, any use not expressly permitted is prohibited. *See, Cohen v. Dane County Board of Adjustment, supra.* Hence, under the zoning ordinances in *Browndale,* any commercial use was banned in a residential zone. No hierarchy or use, prohibited or allowed, applies in the interpretation of restrictive covenants. When a land use is restricted by covenants, it must be expressed and unequivocal. Commercial use per se was not banned by the covenants here, and by implication a commercial use not noxious or offensive was permissible. Nothing in the deed restrictions authorized the court to enjoin any commercial use of the property.

We conclude that, although the plaintiffs had the equitable right to enforce restrictive covenants contained in all the Meadowlane deeds, no covenant was violated. The judgment enjoining the defendants from the present use of their land must be reversed.

*By the Court.*—Judgment reversed, and cause remanded with directions to dissolve the injunction.

DAY, J. *(dissenting in part and concurring in part).*

I would affirm that part of the trial court judgment enjoining use of the property in question "as a facility or home for persons who are not related by blood or marriage."

The Knapps acquired the property by deed which contained certain covenants restricting its use. The ones in question before us are:

"(1) The use of said premises shall be restricted to the construction of one single family dwelling, with a one or two car garage, and shall be used for residential purposes only.
"(2) No garage or outbuilding or part of the same shall be used as a residence at any time, either before or after construction of the residence."

The Knapps bought the property for the purpose of running a boarding house for profit to house eight unrelated mentally retarded adults plus two adult custodians to run the operation. In the offer to purchase the property it was stated that the Knapps made the offer "subject to approval of Wisconsin Industrial Commission (for intended use as a *multi-family-residential*)." The buyers were fully aware of the use restrictions placed on this property at the time of the offer and at the time of purchase.

The record shows the Knapps knew of the plaintiffs' objection to the proposed use of the property prior to consummation of their purchase agreement.

The majority opinion correctly holds that the covenants in question were part of a general plan of development that the Crowleys and Wrights had the right to enforce.

The majority faults the terminology of the restriction for not defining "family" as being limited to those related by blood or marriage. I would hold that the term family must be given the commonly held meaning that people ordinarily give to the term, *i.e.*, persons related by blood, adoption or marriage. All terms are not always defined in contracts or in deeds and in the absence of an included definition showing a modification of the ordinary meaning of a term as used in the particular con-

text, I would hold that the generally accepted definition of the word should apply.

When the legislature has used the term, "family" it has generally used it in terms of its commonly accepted meaning. Thus, sec. 245.001(2), Stats. 1975, says in part:

". . . Marriage is the institution that is the foundation of the *family* and of society. . . ." (Emphasis added.)

The legislature has also designated November as Wisconsin family month, sec. 256.171, Stats. 1975, says it is "to focus attention on the principles of *family* responsibility to spouses, children and parents, as well as on the importance of the stability of marriage and the home for our future well-being. . . ." (Emphasis added.)

In sec. 102.07(5)(c), Stats. 1975, the legislature defines a "family farm corporation" as a corporation whose stockholders are related by blood or marriage.[1]

None of these statutory uses of the word "family" would encompass the concept of eight unrelated adults living with two custodians as falling within the definition of "single family."

The case of *Missionaries Of La Salette v. Whitefish Bay,* 267 Wis. 609, 66 N.W.2d 627 (1954), relied on by the majority is distinguishable. In that case a zoning ordinance restricted use of certain property to single family dwellings. However, the ordinance defined "family" as "one or more individuals living, sleeping, cooking or eating on the premises as a single housekeeping unit." 267 Wis. at 611. The ordinance thus defined in

---

[1] "102.07. **Employe defined** . . . (5) . . . (c) A 'family farm corporation' means a corporation engaged in farming all of whose shareholders are related as lineal ancestors or lineal descendants, or as spouses, brothers, sisters, uncles, aunts, cousins, sons-in-law, daughters-in-law, fathers-in-law, mothers-in-law, brothers-in-law, or sisters-in-law of such lineal ancestors or lineal descendants."

specific terms what a "family" was for purposes of the zoning ordinance. Having defined the term, this Court concluded that eight members of a religious order living together as a unit met the definition of the ordinance. We have no such definition in the case before us and should interpret the word "family" in the sense that Ahrens, the original grantor here and the Wrights and Crowleys undoubtedly interpreted it, that is in its ordinary meaning.

To import the definition of "family" in the Whitefish Bay ordinance to the case at bar is to confuse some things that families may do, *i.e.*, "live, sleep, cook and eat upon the premises as a single housekeeping unit" with what a family is.[2]

I disagree with the conclusion in the majority opinion that "the factual similarity between the nature of the occupancy of the priests and persons in the Knapp home is striking, and the term 'family' used in imposing the purported restriction is identical."

On the contrary the factual *dissimilarity* is what is "striking." The majority's comparison of a commercial boarding house to a monastic order, living in community,[3] such as the Missionaries of Our Lady of La Salette ignores a millennium and a half of western culture.

The members of a religious order, bound by vows to live, work and carry on religious devotions together, addressing each other as "father" or "brother" has long

---

[2] "A frog is a bird—almost,
  When he leaps he flies—almost,
  When he croaks he sings—almost."
        Anon.

[3] "It's a miracle how one roof can cover such diverse characters and maintain the name of family. The Abbot is one father who can honestly say, 'No two of my children are alike.'" Alfred H. Deutsch, O.S.B., "Refining Fire," *Bruised Reeds And Other Stories*, p. 194, (St. John's University Press, Collegeville, Mn., 1971) [An account of monastic life].

been recognized as a special type of relationship dating back to the founder of western monasticism, St. Benedict (c. 480 to c. 547). It is hardly to be compared to a transient boarding house operated for profit.[4]

I also disagree that "the term family used in imposing the purported restriction is identical." On the contrary, the term "family" in *La Salette* was defined by a zoning ordinance; the zoning ordinance provided "a family is one or more individuals living, sleeping, cooking or eating on premises as a single housekeeping unit." *La Salette*, 267 Wis. at 611.

This Court held:

"It is not within the court's province to add or detract from the clear meaning that the village board has expressed in the definition of the word 'family.'" 267 Wis. at 616.

The only holding of *La Salette* is that the living arrangement of the members of the religious order came within the definition of "family" in the ordinance. In my opinion, the *La Salette* case involving the specific definition of "family" in a zoning ordinance has no relevance to the question before us.

Supporting the principle of liberal construction of private deed restrictions to promote the free use of land does not require, nor in my opinion sanction, interpreting "single family dwelling" to include the boarding house arrangement for profit in this case. To do so is to ignore the restriction, not to interpret it.

---

[4] Donald Knapp testified on direct examination that the residents of the home "are not under commitment and live at Meadow Lane on a voluntary basis." John Lowenstein of the Wisconsin Department of Health and Social Services, Bureau of Mental Retardation testified that "[a]ny resident of the Lori Knapp home could leave the home at their own choice. . . ." (R. 433, 542). We can reasonably conclude that if any one of them leaves they will have to be replaced to keep operation profitable.

At the time of oral argument, counsel for the Knapps argued that sec. 46.03 (22) (d), Stats., created by ch. 205, Laws of 1977, is dispositive of the principal issue in favor of the Knapps. I disagree. The pertinent parts of the statute are set forth in the majority opinion. In it, the legislature says that "a community living arrangement with a capacity for eight or fewer persons shall be a permissible use for purposes of any deed covenant which limits use of property to single family or 2-family residences . . ."

I would hold the statute inapplicable because in the case before us ten people are involved and thus not covered.

Counsel for the Crowleys and Wrights argued that his clients acquired their rights prior to the enactment of the statute and that retroactive application would be an unconstitutional impairment of contract. I would not reach that issue on the basis of this record. Even in this statute in the legislatively stated purpose, the act does not say community living is a family but that "the arrangements resemble families. . ." Thus, the legislature recognized that the word "family" as a restriction does not encompass unrelated persons living in groups.

I would affirm that part of the judgment that restrains and enjoins use of the premises as a facility or home for persons not related by blood or marriage and I would concur with the majority in reversing the remainder of the judgment.

I am authorized to state that Mr. Justice WILLIAM CALLOW joins in this dissent.

COFFEY, J. *(dissenting).* I cannot agree with the majority which holds:

(1) the covenant restricting use of the premises to a single family residence was a general plan of development intended for the benefit of all lot owners in the subdivision, and can therefore be enforced by them even

though they are not parties to the deed by which defendants obtained title to the property;

(2) family is an elastic term which can include any group living arrangement;

(3) restrictive covenants are to be construed narrowly because of the policy favoring an owner's free and unencumbered use of his property; and

(4) therefore, the covenant in this case, restricting the use of the property to a single family residence, is meaningless, and there is no general plan of development to enforce.

I would hold that the original grantors, the Ahrens, intended and expressed a restriction on the use of the premises, and that the use by defendants as a group home for eight unrelated retarded adults and a married couple as "houseparents" violates that restriction. Therefore, I woud affirm the judgment of the trial court.

I have no argument with the holding of the court in *Missionaries of La Salette v. Whitefish Bay*, 267 Wis. 609, 66 N.W.2d 627 (1954). The zoning ordinance in that case contained a definition which did not require a blood or marital relationship as a prerequisite to membership in the family group. The priests and lay brothers who occupied the residence were members of a religious order, and were bound by their vows not to enter into a marital relationship. A construction of the ordinance to prohibit their occupancy of the premises would have raised serious questions as to whether the village was interfering with the free exercise of religion or the rights of conscience, in violation of art. I, sec. 18 of the Wisconsin Constitution. I do not agree that the holding of the court in *La Salette* is applicable to the facts of this case.

We are dealing with a private developer's legitimate restrictive covenant, not a municipal zoning ordinance. The difference is important. A municipality has an obligation to legislate evenhandedly with respect to all per-

sons. Legislation which accords different treatment to different classes must be supported, at the very least, by a rational basis. The private developer has no such obligation, being prohibited only from seeking to enforce an invidious discrimination. There is no claim that the covenant in question works an invidious discrimination, nor could there be.

In footnote 3, the majority complains that my dissent, and also that of Justice DAY, "ignore the fundamental concept that private deed restrictions, like zoning and building ordinances, must be strictly construed in favor of the free and unrestricted use of property." The majority forgets that the rule of strict construction is not a rule of law. It should not be used to render a restriction or ordinance meaningless where intent is clear and the activity is obviously within the prohibition. Since the majority demands citation of authority, I offer the following:

"Accordingly, it may well be observed that strict construction is not a precise but rather a relative expression. 'The rule of strict construction has lost much of its force and importance in recent times, since it has become more and more generally recognized that the paramount duty of the judicial interpreter is to put upon the language of the legislature, honestly and faithfully, its plain and rational meaning and to promote its object.' Strict construction of an ordinance means that it must be confined to such subjects or applications as are obviously within its terms and purposes, but it does not require such an unreasonably technical construction that words used cannot be given their fair and sensible meaning in accord with the obvious intent of the legislative body." 6 McQuillin, *Municipal Corporations,* sec. 20.49 (3rd ed. 1969).

Certainly I am as interested as the majority in aiding and helping to provide adequate care, housing and assistance to the more unfortunate members of our community, but within the confines of any lawful restrictions

provided in the deed to the land. Those individuals who have invested their life savings in land and a home, "The American Dream" are entitled to protection under the law, including enforcement of the covenant, which they relied on when investing in the area, restricting use of the property to that of single family residences. The majority opinion has in effect eliminated the single family restriction by defining family as ". . . a group of people who live, sleep, cook and eat upon the premises as a single housekeeping unit. . . ." Are we to assume from this opinion that a group of 30 or 40 retarded or infirm adults or children would constitute a family?

"Family" is used in many ways. Charles Manson's group was a "family." The Pittsburgh Pirates are a "family." But it is obvious, at least to me, that the restrictive covenant in this case would have prevented either from occupying the property in question. Social commentators refer to the "nuclear family" and the "extended family" without having to give a rigorous definition of the terms to convey their meaning. In this case the term used is "single family." The deed restriction is not a social worker's document. It is the obligation of this court to make a common-sense decision as to whether the restriction has been violated, bearing in mind the context in which the term is used. A rigorous definition is not necessary, because it is clear that a group of eight retarded adults and two caretakers does not constitute a single family. The legislature recognized as much in the statement of legislative purpose of ch. 205, Laws of 1977, quoted at length in the majority opinion. The significant part of that statement for the purposes of this case is the following sentence:[1]

---

[1] I agree with the majority that sec. 46.03(22)(d), Stats., is not applicable to this case. There is no need to consider whether it is retrospective, because as applied to single family restrictions, it permits community living arrangements with a capacity of eight or fewer persons. In this case the capacity of the facility is ten persons, the eight retarded adults and the two houseparents.

"The legislature finds that zoning ordinances should not be used to bar all community living arrangements since these arrangements resemble families in all senses of the word except for the fact that the residents might not be related." (Ante, p. 433.)

Not only has the legislature recognized that a community living arrangement is not a single family, but so have the defendants in this case. The trial court made the following uncontroverted findings of fact:

"(10) On July 19, 1973, the defendants, Donald F. Knapp and Bette M. Knapp, made, executed and delivered to Franklin A. Weeks and Mary A. Weeks an offer in writing to purchase 'Lots #1 and #2 Meadowlane Addition' (being the same land as described in the first two deeds referred to in par. 7 hereof), for the sum of $39,900.00, which offer to purchase was accepted by said Weeks on the same day and which offer to purchase provided among other things that the offer was *'subject to approval of Wis. Ind. Comm. (for intended use as multi-family-residential').*

". . .

"(21) That at about the same time [at the time of closing of the transaction] Knapp proceeded to remodel the dwelling on said property and changed the garage into a bedroom and also made certain other structural changes in order to secure approval of the Department of Industry, Labor and Human Relations of the State of Wisconsin so that he could operate and conduct the premises as a multi-family residence."

The two quoted findings of the trial court compel a conclusion that the defendants knew their intended use of the dwelling violated the single family restriction in the deed covenants. Under the pretext of strict construction the majority has set itself up as a mini legislature, and has created a family relationship where it is clear that none exists. I do not agree with the trial court that the term as used in the restrictive covenant must be limited to a relationship by blood or marriage. Adopted children or minor foster children might easily qualify

450

as members of a single family. However, it is not necessary to explore the outer limits of the definition of "single family." A violation of the covenant occurs when there is a plain disregard of the limitations imposed by its express words. *See: Missionaries of La Salette v. Whitefish Bay, supra.*

The plaintiffs were entitled to an injunction against multi-family use of the premises by the defendants. I would modify the injunction granted by the trial court to so state, and would affirm. I am authorized to state that Mr. Justice WILLIAM G. CALLOW joins this dissent.